Leo Rice and Betty Rice v. Commissioner.
Rice v. Comm'r
Docket No. 70154.
United States Tax Court
T.C. Memo 1960-155; 1960 Tax Ct. Memo LEXIS 133; 19 T.C.M. (CCH) 811; T.C.M. (RIA) 60155; July 19, 1960
*133 Betty Rice, pro se, 1684 S.W. 17th Terrace, Miami, Fla., and for Leo Rice. Hugh G. Isley, Jr., Esq., for the respondent. RAUM
Memorandum Findings of Fact and Opinion Respondent determined the following deficiencies in income tax and additions to tax under Section 293(b), Internal Revenue Code of 1939: Additions
Year
Deficiency
to Tax
1943
$ 6,316.39
$3,158.20
1944
5,779.03
2,889.52
1945
13,778.69
6,889.35
1946
6,139.76
3,069.88
1947
194.04
97.02
1948
2,096.04
1,048.02
The issues are: 1. Did the petitioners understate their taxable net income in their Federal income tax returns for each of the taxable years 1943 to 1948, inclusive? 2. Is some part of the deficiencies for each of the taxable years 1943 to 1948, inclusive, due to fraud with intent to evade tax? Findings of Fact Some of the facts have been stipulated, and, as stipulated, are incorporated herein by reference: Petitioners, husband and wife, are residents of Miami, Florida. They were married in 1935. For each of the taxable years 1943 to 1948, inclusive, petitioners filed joint Federal individual income tax returns with the then collector of internal *134 revenue for the district of Florida. These returns were prepared by Betty Rice. During the years involved petitioners were engaged primarily in the operation of "Howey's Juvenile and Students Shop", hereinafter referred to as "Howey's", a proprietorship engaged in the sale of children's wear in Miami, Florida. During some of the years involved, the type of merchandise sold by "Howey's" was in short supply and was "rationed out on allotment". Betty Rice kept the books for Howey's. She had had some prior bookkeeping experience. No books and records were available with respect to petitioners' operations for the years 1943 and 1944. Such books and records as had been maintained for the years 1943 and 1944 had been destroyed. For the years 1945 to 1948, inclusive, petitioners maintained a cash receipts and disbursements journal and a general ledger. Petitioners maintained no record of daily sales. In their cash receipts and disbursements journal petitioners recorded as "sales" an amount which generally corresponded to the deposits in their business checking account. For example, for January, 1945, the journal reflects debits to cash and corresponding credits to sales for eight days, *135 to wit: January 2, 6, 9, 12, 16, 22, 25 and 29. Those are he only dates in January 1945 for which sales were recorded. The dates and amounts of the entries correspond to the dates and amounts of the deposits to petitioners' business checking account. In computing total sales for some years, Betty Rice would adjust the total recorded sales for certain items allegedly paid out of sales receipts prior to their deposit. For example, the cash journal for 1947 reflects the following: Total sales credits
$66,331.27
Salaries for year
3,455.00
Mrs. L. Rice drawing
2,000.00
$71,786.27 The total of $71,786.27 was reported as gross sales in petitioners' 1947 return. For the year 1948, no credits to sales were posted in the cash journal. The reported sales for that year were computed as follows: Total deposits
$69,176.55
Salaries for year
3,560.00
Mrs. Rice
1,500.00
Total
$74,236.55 The total of $74,236.55 was reported as gross sales in petitioners' 1948 return. No records were available with respect to any amounts drawn from cash. The cash journal also was used by petitioners to record purchases. Generally, purchases were recorded by crediting *136 cash in the amount of the check drawn and debiting accounts payable. For example, such a check is entered for January 6, 1945, as follows: Debit
Bank
Account
Date
Description
Credit
Payable
Jan. 6, 1945
Union Under-
wear Co.
$93.60
$93.60
On January 25, 1945, Betty Rice issued a Howey's check in the amount of $1,003.48 to Knickerbocker Clothing Co. This check was for purchases. The check was entered in the cash journal as "loan", and was debited to the Loan and Exchange Account in the general ledger. On February 8, 1945, Betty Rice issued a Howey's check to "The Baby Wear Co." in the amount of $1,003.24. This check was for purchases. The check was entered in the cash journal as "B. W. Exch." and was debited to the "Loan and Exchange" account of the general ledger. The two foregoing purchase checks in the respective amounts of $1,003.48 and $1,003.24, together with a third entry dated January 30, 1945, in the amount of $500 were debited to the Loan and Exchange Account of the general ledger during the year 1945. Balancing credits were made to the Loan and Exchange Account as follows: Date
Amount of Credit
February 1, 1945
$ 500.00
February 26, 1945
500.00
March 5, 1945
503.48
March 19, 1945
1,003.24
*137 In recording their sales, for the foregoing dates in the cash journal, petitioners reduced the amount of the deposits by the amounts and on the dates indicated in arriving at the credited sales. The explanation given in the cash journal in all instances was "Ck Exch". On February 20, 1945, Betty Rice issued a Howey's check in the amount of $1,072.61 to "Diamond Feinstein Merc. Co., Inc." This check was for purchases. The check was recorded in the cash journal by two entries. The first entry is designated as "Diamond Feinstein" and consists of a credit to cash in the amount of $72.61, a debit to accounts payable in the amount of $94.50 and a credit to purchases in the amount of $21.89. The second entry is designated "Leo Rice" and consists of a credit to cash of $1,000 and a debit to "Leo Rice Personal" account in the amount of $1,000. On September 25, 1947, Leo Rice issued a Howey's check to the "David Kurtz Co." in the amount of $1,350. This check was for purchases. The check was debited to the "Leo Rice Personal" account. On October 27, 1947, Betty Rice issued a Howey's check to the "Well Made Pants Co." in the amount of $1,000. This check was for merchandise. In the cash journal *138 the check is reflected as a debit to the "Leo Rice Personal" account. On May 15, 1946, Leo Rice issued unnumbered checks which were drawn on the Howey's business account as follows: Payee
Amounts
Economy Merchandise Co.
$ 200.00
M. Mayberger
177.37
George Gorelick
847.00
Shapiro Jobbing Co.
1,159.00 These checks were for merchandise. They were not recorded in the Howey's books. Petitioners recorded their business expenses in the cash journal. Checks were drawn on the Howey's account as follows: Amount
Maker
Date
Payee
Drawn
of Check
February 21, 1945
Dr. Bascom H. Palmer
$90.00
Betty Rice
September 26, 1945
Dr. Geo. Lilly
50.00
Betty Rice
December 1, 1945
Geo. D. Lilly, M.D.
30.00
Leo Rice
December 4, 1945
B. D. Ross, M.D.
15.00
Leo Rice
December 5, 1945
E. Sterling Nichol, M.D.
35.00
Leo Rice
June 10, 1946
Dr. Coleman
20.00
Leo Rice
June 10, 1946
Geo. D. Lilly, M.D.
5.00
Leo Rice All of the foregoing checks were issued for petitioners' personal medical expenses. Such checks, however, were charged in the cash journal to expenses as follows: Bank
Account
Date
Description
Credit
Debit
Charged
February 22, 1945
Palmer (frt)
$90.00
$90.00
(frt)
October 1, 1945
G. Lilly (frt)
50.00
50.00
(frt)
December 4, 1945
Lilly
30.00
30.00
(frt)
December 4, 1945
Frt
15.00
15.00
(frt)
December 5, 1945
Nichol - adver.
35.00
35.00
(gen)
June 10, 1946
Coleman
20.00
20.00
(frt)
June 10, 1946
Geo. Lilly
5.00
5.00
(frt)
*139 On May 6, 1945, petitioners opened an account in the name of Leo Rice at the First National Bank, Miami, Florida. From the time the account was opened until December 31, 1948, sixty-six checks were written on this account. These checks were not made available to respondent's examining agent by petitioners; nor were they produced at the time of trial by petitioners. In order to obtain information pertaining to the checks written on this account, respondent's examining agent requested the First National Bank to ascertain such information from their recordak film records. Information was available only with respect to seventeen of the checks written on the account during the period here involved. The majority of these checks were written to suppliers of merchandise for merchandise purchased from them. For example checks were written as follows: Date Check
Amount
Cleared
Payee
of Check
June 6, 1945
Dunn & Friedman
$ 739.00
June 8, 1945
Shapiro Jobbing Co.
323.50
June 8, 1945
Shapiro Jobbing Co.
1,127.50
Sept. 28, 1945
Shapiro Jobbing Co.
541.50
Sept. 29, 1945
Dunn & Friedman
1,173.00
Oct. 1, 1945
M. Mayberger
979.32
Oct. 2, 1945
George Gorelick
662.25
Oct. 10, 1945
George Gorelick
647.75
June 21, 1946
Unity Dry Goods Co.
670.45
Nov. 28, 1947
Well Made Pants Co.
1,000.00
Dec. 29, 1947
Coleman Garment Co.
469.66
Jan. 2, 1948
Well Made Pants Co.
835.00
Dec. 7, 1948
J. Rabin
1,000.00
Dec. 29, 1948
J. Rabin
1,000.00
Total
$11,168.93
*140 Most of the suppliers to whom these checks were issued were located on Orchard Street, New York City. The Orchard Street suppliers were not "legitimate" business sources, but were sources through which petitioners obtained merchandise when it was in short supply. These purchases were not recorded on Howey's books. Among petitioners' customers, during the years involved, was the Miami Military Academy, which is located in Miami, Florida. On September 18, 1946, Miami Military Academy issued its check in the amount of $816 to Howey's Juvenile Shop in payment for 49 dozen "T" shirts and 20 dozen undershirts. This check was endorsed and deposited in the "Howey's" account at the First National Bank, Miami, Florida, and cleared the Miami Military Account at the Little River Bank on September 21, 1946. The only deposit made to the Howey's business account between September 18, 1946 (the date the check was written) and September 21, 1946 (the date the check cleared the Little River Bank) was made on September 19, 1946. This deposit was in the amount of $1,491. Of this sum, $491 was recorded as sales and $1,000 was shown as additional investment in the business. Petitioners' return for the *141 year 1943 contained no profit and loss statement pertaining to Howey's. In this return, they reported income in the amount of $2,917.69. In their return for each of the years 1944 to 1948, inclusive, petitioners reported total receipts and net profit from Howey's as follows: Year
Total Receipts
Net Profit
1944
$41,290.96
$4,040.98
1945
57,908.76
5,641.54
1946
63,087.78
4,717.25
1947
71,786.27
5,705.46
1948
74,236.55
6,103.52
On January 15, 1937, Leo Rice opened a savings account in his name at the First Federal Savings and Loan Association of Miami, Florida, with a deposit of $342.29. Additional deposits were made to this account, prior to the years involved, as follows: Date of Deposit
Amount
February 8, 1937
$ 10.00
February 16, 1937
20.00
February 18, 1937
15.00
February 23, 1937
24.00
March 3, 1937
5.00
March 8, 1937
27.00
March 22, 1937
22.00
June 30, 1937
72.00
December 24, 1937
50.00
December 27, 1937
35.00
January 10, 1938
10.00
January 11, 1938
10.00
January 12, 1938
7.00
January 17, 1938
41.00
January 18, 1938
8.00
January 22, 1938
19.00
January 25, 1938
40.00
January 26, 1938
60.00
February 8, 1938
30.00
February 10, 1938
27.00
February 11, 1938
30.00
February 15, 1938
35.01
February 16, 1938
10.00
February 19, 1938
58.00
March 2, 1938
20.00
March 3, 1938
30.00
March 15, 1938
20.00
March 18, 1938
5.00
June 14, 1938
10.00
August 5, 1938
75.00
October 18, 1938
25.00
December 23, 1938
48.50
January 7, 1939
23.00
March 13, 1939
12.25
March 13, 1939
62.22
March 21, 1939
73.00
March 22, 1939
105.26
March 31, 1939
250.00
April 6, 1939
200.00
April 24, 1939
15.00
*142 Withdrawals were made from this account prior to the years involved as follows: Date of Withdrawal
Amount
April 12, 1937
$ 50.00
April 29, 1937
50.00
May 26, 1937
15.00
September 13, 1937
250.00
October 19, 1937
125.00
November 24, 1937
10.00
January 14, 1938
10.00
January 31, 1938
290.00
February 24, 1938
35.00
March 7, 1938
15.00
March 10, 1938
50.00
March 29, 1938
160.00
May 9, 1938
5.00
June 30, 1938
29.00
August 13, 1938
10.00
September 6, 1938
25.00
December 29, 1938
50.00
January 18, 1939
20.00
April 13, 1939
500.00
May 10, 1939
285.00
On February 3, 1937, petitioners opened a savings account at the First Federal Savings and Loan Association in Miami, in the name of "Howard Martin Rice - a minor, by Leo Rice". This account was opened with a deposit of $25 and, prior to the years involved, deposits were made to the account as follows: Date
Amount of Deposit
February 3, 1937
$ 25.00
February 8, 1937
10.00
August 11, 1939
5.00
September 18, 1939
150.00
March 25, 1940
500.00
February 8, 1941
10.00
February 10, 1941
10.00
February 17, 1941
$ 10.00
March 31, 1941
20.00
April 9, 1941
250.00
December 7, 1942
525.00
December 10, 1942
500.00
*143 Prior to the years involved the following withdrawals were made from this account: Date
Amount of Withdrawal
March 29, 1938
$ 25.00
October 12, 1939
150.00
June 10, 1940
400.00
July 11, 1940
100.00
July 2, 1941
250.00
July 17, 1941
60.00
On December 21, 1939, petitioners made application to the Federal Housing Administration for the insurance of a mortgage loan on a house they were purchasing for their home. The total price of the house was $6,500 and the application was for a mortgage in the amount of $5,000, payable at the rate of $27.80 per month. In the personal financial statement, which was a part of the application, and signed by both petitioners, the petitioners stated the total value of all of their assets to be $12,250 less $3,500 in accounts payable and a note payable in the amount of $500. Prior to the years involved, petitioners operated their children's clothing store as a corporation under the name of "Howard's Juvenile Shop, Inc." The corporation was incorporated in January, 1939. The first corporate return for the period January 28, 1939 to December 31, 1940, was signed by Leo Rice as President and was prepared by Betty Rice. Schedule *144 "M" of the corporation return reflects a bank loan in the amount $500of. Residents of the State of Florida are required by the law of that state to file a declaration or return with the state authorities for the purpose of determining their liability for the state tax on intangible property. The law requires such residents to report monies on hand as well as those in commercial bank accounts, savings accounts, or in the form of certificates of deposit. In 1944, petitioners filed an intangible tax return in which they declared that as of January 1, 1944, they had cash on hand and in banks in the total amount of $6,800. During the years 1945, 1946 and 1947, petitioners made the following transfers of funds between their various bank accounts: "(a) On June 22, 1945, petitioners transferred $1,500 from their business account to the Leo Rice checking account. "(b) On August 25, 1945, they transferred $2,000 from their business account to the Leo Rice checking account. "(c) On November 13, 1945, they transferred $2,000 from savings account # X5773 in the name of Leo Rice to their business account. "(d) In July, 1946, they transferred $1,000 from the Leo Rice checking account *145 to their business checking account. "(e) On October 31, 1946, petitioners transferred $1,500 from savings account # X5773 in the name of Leo Rice, to their business checking account. "(f) On October 18, 1947, petitioners transferred $3,000 from savings account # X5773 in the name of Leo Rice to their business checking account. "(g) In the year 1947, they transferred $3,000 from savings account # X5773 in the name of Leo Rice to the Leo Rice checking account." As of December 31st of each of the years 1942 to 1948, inclusive, the balance in the Howey's checking account at the First National Bank, Miami, Florida, was as follows: Date
Amount
December 31, 1942
$ 7,611.23
December 31, 1943
10,814.74
December 31, 1944
6,906.91
December 31, 1945
5,072.03
December 31, 1946
5,946.96
December 31, 1947
6,139.83
December 31, 1948
5,889.45 Both of the petitioners could draw upon this account. As of December 31st of each of the years 1942 to 1948, inclusive, petitioners' merchandise inventory was as follows: Date
Amount
December 31, 1942
$ 7,010.50
December 31, 1943
7,525.10
December 31, 1944
8,750.25
December 31, 1945
10,419.75
December 31, 1946
12,203.27
December 31, 1947
13,225.10
December 31, 1948
14,139.25
*146 As of December 31st of each of the years 1942 to 1948, inclusive, petitioners' investment in their business furniture and fixtures was as follows: Date
Amount
December 31, 1942
$1,612.42
December 31, 1943
750.00
December 31, 1944
750.00
December 31, 1945
1,479.41
December 31, 1946
$1,687.41
December 31, 1947
1,734.31
December 31, 1948
1,751.59
As of December 31st of each of the taxable years 1945 to 1948, inclusive, the balance in the checking account in the name of Leo Rice at the First National Bank, Miami, Florida, was as follows: Date
Amount
December 31, 1945
$2,595.70
December 31, 1946
1,131.43
December 31, 1947
2,693.84
December 31, 1948
6,005.42
On December 16, 1942, petitioners opened savings account No. X5733 in the name of Leo Rice at the First National Bank at Miami, Florida. As of December 31st of each of the taxable years 1942 to 1948, inclusive, the balance in this account was as follows: Date
Amount
December 31, 1942
$2,000.00
December 31, 1943
6,033.33
December 31, 1944
5,083.55
December 31, 1945
9,537.52
December 31, 1946
5,591.88
December 31, 1947
1,265.09
December 31, 1948
1,529.01
*147 Prior to and during the period December 31, 1942 to February 27, 1947, inclusive, petitioners maintained savings account No. XXXX at the First Federal Savings and Loan Association of Miami, Florida. As of December 31st of each of the taxable years 1942 to 1948, inclusive, the balance in this account was as follows: Date
Amount
December 31, 1942
$ 5.85
December 31, 1943
6.01
December 31, 1944
6.17
December 31, 1945
6.29
December 31, 1946
1,008.90
December 31, 1947
0
December 31, 1948
0
Prior to and during the taxable years 1942 to 1948, inclusive, petitioner maintained savings account No. XXXX in the name of "Howard Martin Rice, by Leo Rice" at the First Federal Savings and Loan Co., Miami, Florida. As of December 31st of each of the taxable years 1942 to 1948, inclusive, the balance in this account was as follows: Date
Amount
December 31, 1942
$1,036.49
December 31, 1943
5,054.81
December 31, 1944
5,138.72
December 31, 1945
$5,242.00
December 31, 1946
5,334.13
December 31, 1947
5,414.45
December 31, 19438h5,523.27
On October 10, 1942, petitioners opened savings account No. X6518 in the name of "Mrs. Betty C. Rice or *148 Leo Rice" at the First Federal Savings and Loan Co., Miami, Florida. The balance in this account as of December 31st of each of the taxable years 1942 to 1948, inclusive, was as follows: Date
Amount
December 31, 1942
$ 500.00
December 31, 1943
3,011.30
December 31, 1944
5,055.40
December 31, 1945
5,140.18
December 31, 1946
5,230.51
December 31, 1947
5,309.26
December 31, 1948
5,415.97
On December 31, 1944, petitioners opened savings account No. X2954 in the name of "Leo Rice, Trustee for Richard Clark Rice" at the Dade Federal Savings and Loan Co., Miami, Florida. As of December 31st of each of the taxable years 1944 to 1948, inclusive, the balance in this account was as follows: Date
Amount
December 31, 1944
$4,080.00
December 31, 1945
4,120.80
December 31, 1946
4,203.62
December 31, 1947
5,238.10
December 31, 1948
5,340.18
On March 31, 1944, petitioners opened savings account No. X1673 in the name of "Leo Rice" at the Dade Federal Savings and Loan Co. at Miami, Florida. The balance in this account as of December 31st of each of the taxable years 1944 to 1948, inclusive, was as follows: Date
Balance
December 31, 1944
$5,031.25
December 31, 1945
5,132.37
December 31, 1946
5,235.52
December 31, 1947
5,340.74
December 31, 1948
5,448.08
*149 On April 30, 1945, petitioners opened savings account No. X3645 in the name of "Betty Mazer Rice" at the Dade Federal Savings and Loan Co., Miami, Florida. The balance in this account as of December 31st of each of the taxable years 1945 to 1948, inclusive, was as follows: Date
Balance
December 31, 1945
$ 701.33
December 31, 1946
1,895.73
December 31, 1947
2,126.94
December 31, 1948
2,172.68
As of December 31st of each of the taxable years 1942 to 1948, inclusive, petitioners' investment (at cost) in United States Savings Bonds was as follows: Date
Amount
December 31, 1942
$ 562.50
December 31, 1943
3,937.50
December 31, 1944
7,687.50
December 31, 1945
11,437.50
December 31, 1946
11,437.50
December 31, 1947
11,887.50
December 31, 1948
12,712.50
During each of the years 1945 to 1948, inclusive, the petitioners maintained a brokerage account with Bache and Co., a stock brokerage firm. As of December 31st of each of the taxable years 1945 to 1948, inclusive, petitioners' investment (at cost) in stock purchased through Bache and Co., was as follows: Date
Amount
December 31, 1945
$ 9,578.68
December 31, 1946
19,000.85
December 31, 1947
19,000.85
December 31, 1948
19,000.85
*150 As of December 31st of each of the taxable years 1942 to 1948, inclusive, petitioners' investment in the stock of Metropolitan Bus Line, which stock was not purchased through Bache and Co., was as follows: Date
Amount
December 31, 1942
0
December 31, 1943
0
December 31, 1944
0
December 31, 1945
0
December 31, 1946
$1,200.00
December 31, 1947
2,947.50
December 31, 1948
0
As of December 31st of each of the taxable years 1942 to 1948, inclusive, petitioners' investment (at cost) in certain real estate lots in Coral Gables, Florida, was as follows: Date
Amount
December 31, 1942
0
December 31, 1943
0
December 31, 1944
0
December 31, 1945
$ 907.50
December 31, 1946
1,593.75
December 31, 1947
0
December 31, 1948
0
As of December 31st of each of the taxable years 1942 to 1948, inclusive, petitioners' investment (at cost) in certain real estate known as Bay Harbor Island was as follows: Date
Amount
December 31, 1942
0
December 31, 1943
0
December 31, 1944
0
December 31, 1945
0
December 31, 1946
$ 3,712.50
December 31, 1947
6,725.00
December 31, 1948
10,045.75
On August 3, 1945, petitioners purchased *151 a delivery car for use in their business, at a cost of $1,049. Petitioners owned this car as of December 31st of each of the years 1945 to 1948, inclusive. During the taxable years 1942 to 1948, inclusive, the petitioners owned a home at 1684 S.W. 17th Terrace, Miami, Florida. The petitioners' investment in such home as of December 31st of each of the taxable years 1942 to 1948, inclusive, without considering the mortgage payable (see next paragraph) was as follows: Date
Amount
December 31, 1942
$6,500.00
December 31, 1943
6,500.00
December 31, 1944
6,500.00
December 31, 1945
6,500.00
December 31, 1946
6,500.00
December 31, 1947
6,500.00
December 31, 1948
6,500.00
As of December 31st of each of the taxable years 1942 and 1943, petitioners' home (referred to above) was encumbered by a mortgage payable. The balance of the mortgage indebtedness was liquidated by petitioners during the taxable year 1944. The balance due on the mortgage payable as of December 31st of each of the taxable years 1942 to 1944, inclusive, was as follows: Date
Amount
December 31, 1942
$5,004.66
December 31, 1943
4,608.66
December 31, 1944
0
*152 As of December 31st of each of the taxable years 1942 to 1948, inclusive, petitioners owed business accounts payable in the following amounts: Date
Amount
December 31, 1942
$ 821.13
December 31, 1943
1,255.05
December 31, 1944
1,255.05
December 31, 1945
693.61
December 31, 1946
369.77
December 31, 1947
712.11
December 31, 1948
878.63
As of December 31st of each of the years 1942 to 1948, inclusive, petitioners' reserve for depreciation of their business delivery car was as follows: Date
Amount
December 31, 1942
0
December 31, 1943
0
December 31, 1944
0
December 31, 1945
$ 87.40
December 31, 1946
297.20
December 31, 1947
507.00
December 31, 1948
716.80
As of December 31st of each of the years 1942 to 1948, inclusive, the reserve for depreciation of petitioners' business furniture and fixtures was as follows: Date
Amount
December 31, 1942
$ 75.00
December 31, 1943
150.00
December 31, 1944
225.00
December 31, 1945
372.94
December 31, 1946
541.68
December 31, 1947
715.11
December 31, 1948
890.27
During the taxable year 1945 petitioners paid a nondeductible personal insurance premium in *153 the amount of $3,953.87. During the taxable year 1943 petitioners expended at least $3,000 for personal living expenses. During the taxable year 1944 petitioners expended at least $3,500 for personal living expenses. During the taxable year 1945 petitioners expended at least $4,911.38 for personal living expenses. During the taxable year 1946 petitioners expended at least $7,350.22 for personal living expenses. Included in this amount were payments by check for insurance premiums in the amount of $626.47, a personal automobile in the amount of $1,365.55, and checks to a resort by the name of Lakeside Inn in the amount of $1,233.08. During the taxable year 1947 petitioners expended at least $5,551.05 for personal living expenses. Included in this amount are payments to a camp for petitioners' children in the amount of $800, life insurance premiums in the amount of $377.60 and payments for a piano in the amount of $500. During the taxable year 1948, petitioners expended at least $7,381.99 for personal living expenses. Included in this amount are payments for an automobile in the amount of $1,559.80. For the taxable years 1946 to 1947, petitioners realized long-term capital *154 gains in the amounts of $677.60 and $695.04, respectively. During the taxable year 1948 petitioners' investment in the Metropolitan Bus Line became worthless. At the time such investment became worthless petitioners' investment therein was $4,447.50. For the taxable year 1948, petitioners are entitled to a capital loss as a result of such worthlessness in the amount of $1,000. In their returns for each of the taxable years 1944 to 1948, inclusive, petitioners claimed the standard deduction in arriving at their net taxable income. The following table shows the net income reported by petitioners for the years 1943-1948 and the net income which respondent determined they had received in those years: Net Income
Net Income
Determined
Year
Reported
by Commissioner
1943
$2,917.69 *
$19,680.88
1944
4,040.98 *
19,390.62
1945
5,141.54
32,621.66
1946
4,599.52
21,499.62
1947
5,795.46
6,612.51
1948
5,229.47
16,203.50
*155 Part of the deficiency for each of the years 1945 and 1946 was due to fraud with intent to evade tax. No part of the deficiency for each of the years 1943, 1944, 1947 and 1948 was due to fraud with intent to evade tax. Opinion RAUM, Judge: The corrected net income determined by respondent is based upon the annual increases in petitioners' net worth, as determined by respondent, with appropriate adjustments for nondeductible personal expenses and other pertinent items such as capital gains and losses. Virtually all of the figures in the net worth statement are presently uncontested and appear in our findings. However, the one item that is pivotal in this case is opening cash. Petitioners claim that Betty Rice had a cash hoard at the beginning of the period in controversy and that the various apparent increases in net worth are explainable as coming from that cash hoard rather than from currently taxable income. If they are correct in that contention, then the Government's case collapses. At the outset we dispose of a preliminary argument made by petitioners, namely, that the Commissioner was without authority to resort to the net worth method at all. The point is without merit. *156 Aprt from the fact that books and records were unavailable for the years 1943 and 1944, it is clear from our inspection of the books for 1945-1948 that such books were inadequate. Moreover, the existence of books and records, even where they are apparently adequate, does not preclude the use of the net worth method. Holland v. United States, 348 U.S. 121, 130-132; Morris Lipsitz, 21 T.C. 917, 930, affirmed, 220 F. 2d 871 (C.A. 4), certiorari denied, 350 U.S. 845; Estate of George L. Cury, 23 T.C. 305, 333-334. Petitioners presented no evidence to establish that the amounts shown on respondent's net worth statement for assets (which did not include any undeposited cash on hand as of December 31, 1942), liabilities, and nondeductible expenditures were erroneous. And on the basis of the stipulated facts and evidence offered by respondent we are satisfied and find that every figure appearing on the net worth statement is correct. There remains, therefore, only the issue of the alleged hoard of undeposited cash. The bizarre story of the principal source of the alleged hoard, as it appears in Betty's testimony before us *157 and in a sworn statement which she gave to a special agent of the Intelligence Unit of the Internal Revenue Service, may be summarized as follows: In 1928, when Betty was 22 years of age, she was employed by a man named John L. Newman in his wholesale lamp business in New York City. She did bookkeeping and was in charge of the showroom. Her salary was $30 a week. Newman was then about 55 years old. He was wealthy; before coming to New York he had accumulated a considerable amount of money in the Chicago underworld in connection with bootlegging, prostitution, and other activities. In addition to paying Betty her $30 weekly salary, Newman maintained her in a "luxury suite" in a New York hotel, paying all her expenses, giving her jewelry, furs and "very handsome" weekly "stipends". Also, Newman gambled heavily at the race track, and, when he won, he would "give" Betty "very handsomely, sometimes two or three thousand dollars". Finally, over and above all of the foregoing generosities, Newman gave Betty $90,000 in cash during the latter part of 1928 or early 1929, $15,000 at each of "six different sessions". Such cash was in old large-size $1,000 bills. She received each $15,000 gift *158 in a large envelope on a Saturday night, and on Sunday morning she would take it to the home of her parents in Philadelphia, where she had a room that was always locked and accessible only to her. She put the money received from Newman in a metal compartment in a steamer trunk in this room. Newman's wife, who had "run off" with another man and "had had her fling", came back early in 1929 and reestablished herself in Newman's apartment. Betty thereupon, at Newman's suggestion, went back to Philadelphia to live, to remain there until he might become free to marry her. She saw him thereafter on occasion, the last time being in 1930. He died in 1933. After the change in currency from the large to the small size bills occurred, Betty (sometimes with the aid of her sister) went to various banks in Philadelphia and converted the $1,000 bills into $100 bills of the new size. She was never employed from 1929 to March 1935, when she married Leo Rice in Miami. During that period (1929-1935) she wintered in Miami where she maintained an apartment and employed a fulltime maid; she summered at Lake George, New York, or in Maine. When she married in 1935 she had in excess of $100,000 in cash in her *159 trunk in Philadelphia. Her parents had died, but she still had her locked room in the house, which was otherwise occupied by her sister. Leo Rice "had nothing", and from time to time until 1939, Betty would bring down some cash from Philadelphia to Miami. In 1939 she brought down all the remaining money to Miami in a suitcase, and kept it in two metal boxes at her residence. The $5,000 required to start the Howey's business in 1939 came from this fund, and subsequently, throughout the tax years involved, this fund was the source of the various bank deposits, investments and the like that furnish the basis for the apparent increase in net worth. [1]
Although we are convinced that Betty was employed by Newman during 1928 or early 1929, and that she had some such relationship with him during *160 that period as she described, we are not convinced by her completely uncorroborated testimony that any funds obtained from Newman had not been dissipated prior to 1943. We do not find it necessary to detail all the evidence leading us to that conclusion. However, the following evidence gives some indication of the weakness of petitioners' position: they filed an application for a $5,000 mortgage loan to finance the purchase of a $6,500 home in December 1939 and signed a financial statement showing their total assets and liabilities to be $12,250 and $4,000, respectively; that application listed a liability on a $500 note payable on February 1, 1940; the application contained a statement that their prior annual housing expenses amounted to $150; Betty's testimony as to the amount of undeposited cash in the latter part of 1939 or early 1940 or on any subsequent date was unsatisfactorily vague; the balance on mortgage loan was fully discharged with a payment of $4,527.40 on March 3, 1944, one day after petitioners had withdrawn $4,526.83 from Howey's business checking account; many of the bank deposits in question during the tax years were not made with $100 bills, which allegedly comprised *161 the cash hoard, but were in smaller bills, which Betty testified, unconvincingly, she had obtained immediately prior to the making of each such deposit by exchanging the $100 bills into bills of lower denominations; the amounts, frequency and general timing of the bank deposits and withdrawals were such as to render Betty's story highly doubtful; and in 1944 petitioners filed an intangible tax return with the State of Florida declaring that as of January 1, 1944, they had cash on hand and in banks in the aggregate amount of $6,800. After careful consideration of all of the evidence we have reached the conclusion that petitioners have not sustained their burden of proving that they had undeposited cash on hand as of January 1, 1943, which was responsible for the apparent increases in their net worth during the taxable years, or that the respondent erred in treating such increases as attributable to unreported taxable income. Petitioners' brief, prepared by Betty, suggests that any tax for the years 1943 and 1944 is barred by limitations. No such issue is raised in the pleadings. And although Betty Rice appeared pro se at the trial, petitioners' pleadings were prepared by an attorney *162 who represented them at that time. At the trial, the Court, addressing itself to both parties, specifically inquired whether there was any statute of limitations issue in the case, and was informed by Government counsel, without contradiction, that none had been pleaded. No evidence with respect to any such issue was presented at the trial. "Orderly procedure requires that the issues be clearly framed in the pleadings [so] that both parties may have notice and an opportunity to produce their evidence." United Business Corporation of America, 19 B.T.A. 809, 831, affirmed (without discussion of this point), 62 F. 2d 754 (C.A. 2), certiorari denied, 290 U.S. 635. "Where a taxpayer fails to rely upon the statute of limitations in his pleadings or does not otherwise attempt to bring it into the case as an issue until after trial and submission by the parties, the Tax Court may ordinarily regard the question as having legally been waived by him and refuse to consider it." Given v. Commissioner, 238 F. 2d 579, 583 (C.A. 8), affirming a Memorandum Opinion of this Court. Here petitioners' attempt to bring the statute of limitations into *163 the case on brief comes too late; no motion to amend the pleadings to raise an issue as to the running of the statute has been filed; nor would any such motion be acted upon favorably at this late time, since the evidence is already in, and, for aught we know, the Commissioner might have a complete defense against such issue by signed waivers or by other evidence which he did not present upon the correct assumption that the issue was not before the Court. We hold that the issue cannot be raised at this time. There remains the question whether respondent has sustained his burden of proving by clear and convincing evidence that part of the deficiency for each of the taxable years was due to fraud with intent to evade tax. The failure of petitioners to overcome the presumptive correctness of the deficiencies determined by respondent for those years does not create any presumption of fraud, or relieve him of the obligation of presenting independent evidence from which fraudulent intent on the part of petitioners can properly be inferred. Kashat v. Commissioner, 229 F. 2d 282, 285 (C.A. 6), affirming in part and reversing in part a Memorandum Opinion of this Court; Drieborg v. Commissioner, 225 F. 2d 216, 218 *164 (C.A. 6), affirming in part and reversing in part a Memorandum Opinion of this Court. Where such evidence is not presented both parties may fail through failure to sustain their respective burdens. Olinger v. Commissioner, 234 F. 2d 823, 824 (C.A. 5), affirming in part and reversing in part a Memorandum Opinion of this Court; L. Schepp Co., 25 B.T.A. 419, 437. In support of his contention that part of the deficiency for each of the taxable years is due to fraud with intent to evade tax, respondent points to the substantial and consistent understatements of petitioners' net income reflected in his net worth statement and to evidence produced by him to prove that such understatements were made with intent to evade tax. To the extent that respondent is relying upon his net worth statement as evidence that petitioners understated their net income for each of the taxable years, he has the burden of establishing by clear and convincing evidence that that statement accurately reflects petitioners' net worth both at the beginning of the net worth period and at the end of each of the taxable years. The net worth statement does not give petitioners credit for any *165 undeposited cash on hand as of January 1, 1943, the beginning of the net worth period. We are convinced from evidence in the record that in all other respects it correctly reflects petitioners' net worth at all times material herein. The reliability of the net worth statement as evidence of unreported income depends therefore upon whether respondent has sustained his burden of proving clearly and convincingly that petitioners possessed no undeposited cash on January 1, 1943. Failure on his part to sustain this burden would seriously detract from the reliability of the opening net worth shown on the net worth statement and from the reliability of the statement itself as proof of unreported income because "the inference of unreported income can be drawn only if, and the if is a big one, a starting, opening net worth statement is established with some reliability." Phillips' Estate v. Commissioner, 246 F. 2d 209, 213 (C.A. 5). At the trial respondent attempted to prove that petitioners had no substantial amount of undeposited cash on hand as of January 1, 1943, by testimony of the special agent of the Intelligence Unit who interviewed both of the petitioners in 1939 and *166 made an investigation to determine the truth or falsity of Betty's cash-fund story, by introducing in evidence question-and-answer statements made by both petitioners in 1939, by testimony of Betty, and by other evidence introduced with the apparent objective of casting doubt upon Betty's story that she possessed a substantial amount of cash on January 1, 1943, which accounted for the increases in net worth. The special agent testified that after Betty identified her generous benefactor as Newman, he interviewed Newman's wife and nephew, former employees of Newman's store, Betty's sister, who allegedly accompanied her when the $1,000 bills were cashed, and others, in an attempt to determine the truth or falsity of Betty's story. When asked whether he was able to ascertain from those interviews whether she did or did not receive cash gifts from Newman, he replied that he received no information from the persons interviewed which would substantiate her story, and that "There was no positive proof that it was not true". A careful consideration of all of the evidence leaves us with a similar reaction. We had an opportunity to observe Betty on the witness stand and hear her story. We *167 are not convinced that it was pure fiction. We are convinced that during the period Newman "dated" her in the latter part of 1928 and early 1929 he gave her substantial amounts of cash. However, we are not convinced from her testimony or any other evidence in the record that she still had on January 1, 1943, any amount of this cash, or any cash obtained through inheritance. Although we were therefore required to hold that petitioners have not carried their burden of proof, it is quite a different matter to find that respondent has carried his heavy burden of proving fraud on this state of the record. We are unable to conclude, therefore, that respondent has clearly and convincingly established by the net worth method that petitioners understated their net income for each of the taxable years. The question arises whether other evidence produced by respondent showing certain omissions from, and falsifications of petitioners' books, qualifies as clear and convincing evidence that their net income was understated in any of the taxable years with intent to evade tax. No such evidence was produced for the years 1943 and 1944. However, evidence was produced showing that in each of the years *168 1945 and 1946 checks issued for petitioners' personal medical expenses were charged on their books as business expenses, and that sales proceeds were recorded therein as repayment of nonexistent loans and as additional investment in the business. These entries were clearly false and resulted in understatements of petitioners' net income for 1945 and 1946. We therefore hold, and have found as a fact, that part of the deficiencies for each of these years was due to fraud with intent to evade tax. For the years 1947 and 1948, evidence was produced by respondent showing that "sales-deposit" figures were increased by amounts allegedly paid as salaries and personal drawings, that certain purchases of merchandise made by checks drawn on the Leo Rice Personal Account were not recorded on Howey's books, and that in 1947 the amounts of two Howey's checks issued for merchandise were recorded on its books as personal withdrawals. The evidence is not clear and convincing that these acts resulted in any understatement of petitioners' income for 1947 and 1948, and we cannot find that any part of the deficiency for either of those years was due to fraud with intent to evade tax. Decision will be *169 entered under Rule 50. Footnotes
*. This is the income figure shown on the return, without deductions. Since the tax was computed by tables which automatically incorporated the standard deduction, the income figure shown on the return was actually in excess of net income.↩
1. An additional, but distinctly secondary source for the alleged cach hoard was some money and jewelry allegedly inherited from her mother in 1927 as well as some resources allegedly inherited from her father in 1931. Betty's testimony about these legacies was far from satisfactory, and we cannot find that any portion thereof remained unexpended at the beginning of the taxable years before us.↩