**Armand C. FEICHTMEIR, Appellant,**

v.

**UNITED STATES of America,**
**Appellee.**

**No. 20931.**

United States Court of Appeals
Ninth Circuit.

Feb. 6, 1968.

Alva C. Baird (argued), of Baird, Holley, Baird & Galen, Los Angeles, Cal., for appellant.

Jo Ann Dunne (argued), Asst. U. S. Atty., Manuel L. Real, U. S. Atty., Robert L. Brosio, Asst. U. S. Atty., Chief,

Criminal Division, Los Angeles, Cal., for appellee.

Before DUNIWAY and ELY, Circuit Judges, and PECKHAM, District Judge.

PECKHAM, District Judge:

Appellant was charged in a four count indictment with wilfully attempting to evade or defeat payment of his income tax for the calendar years 1958, 1959, 1960, and 1961 in violation of 26 U.S.C. § 7201, entered a plea of not guilty and waived a jury; and was found guilty by the Court on Count Two for the year 1959 and Count Four for the year 1961, and acquitted on the other two counts for the years 1958 and 1960. The appellant did not testify at the trial. He appeals to this Court under the provisions of Title 28 United States Code sections 1291 and 1294.

The Government proceeded on the net worth theory [1] and introduced evidence from which the following understatements of income and tax liability were computed:

### 1958

|  | Per Return | Corrected |
| --- | --- | --- |
| Taxable Income | $50,472.53 | $ 58,962.10 |
| Income Tax Liability | 20,509.84 | 25,727.55 |

### 1959

|  | Per Return | Corrected |
| --- | --- | --- |
| Taxable Income | 38,522.15 | 134,477.56 |
| Income Tax Liability | 13,661.86 | 79,857.62 |

### 1960

|  | Per Return | Corrected |
| --- | --- | --- |
| Taxable Income | 48,188.06 | 57,501.91 |
| Income Tax Liability | 18,494.04 | 23,410.77 |

### 1961

|  | Per Return | Corrected |
| --- | --- | --- |
| Taxable Income | 64,126.25 | 95,299.23 |
| Income Tax Liability | 28,612.25 | 49,547.73 |

Appellant makes a three-pronged attack upon his conviction. First, he argues that the trial court improperly treated the increases in net worth as being from unreported taxable income, when the Government did not (a) prove a likely source of unreported taxable income, and/or (b) did not negative all possible nontaxable sources. Second, he contends that the Government did not

---

1. "The Supreme Court (In Holland v. United States (1954) 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150, reh. den. 348 U.S. 932, 75 S.Ct. 334, 99 L.Ed. 731), has described this pattern as follows: in a typical net worth prosecution, the government, having concluded that the taxpayer's records are inadequate as a basis for determining income tax liability, attempts to establish an opening net worth, that is, the total net value of the taxpayer's assets at the beginning of a given year. The government then proves increases in the taxpayer's net worth for each succeeding year during the period under examination and calculates the difference between the adjusted net value of the taxpayer's assets at the beginning and end. The taxpayer's non-deductible expenditures, including living expenses, are added to these increases, and if the resulting figure for any year is substantially greater than the taxable income reported by the taxpayer for that year, the government claims that the excess represents unreported taxable income, asking the jury to infer wilfulness from the taxpayer's understatement taken in connection with direct evidence of conduct the likely result of which would be to mislead or to conceal." ANNOTATION. Use of net worth in prosecution for evasion of federal income tax. 99 L.Ed. 167–168.

make a prima facie case on the issue of wilfulness; and third, he maintains that the trial court erroneously admitted evidence which had been obtained from the appellant in violation of his rights under the Fourth, Fifth, and Sixth Amendments.

After a careful review of the evidence and authorities, we cannot agree and therefore affirm.

## I.

■ The evidence was sufficient to support an inference that appellant's net worth increases were attributable to currently taxable income from a likely source and were not derived from nontaxable sources. Appellant's economic history from December 21, 1950, to December 21, 1961, reflected a proliferation of business interests and a continuous increase in net worth and expenditures. In 1950 he was an insurance broker and agent operating a sole proprietorship. In 1951 he commenced an insurance program for bracero and agricultural laborers, and by 1961 he insured all but two growers using such labor in the State of California. During this expansion he incorporated his insurance business, owned the controlling stock interest, and served as president. In addition to his insurance brokerage, he had other ventures: (a) he owned the majority of stock in the Fuller Commissary Company (later called San Luis Rey Properties) incorporated in 1956 and operating a farm camp for farm laborers in San Diego County; (b) appellant's family owned a majority of stock from 1953 until 1956 when they acquired the total ownership in Maps, Incorporated, which engaged in the business of housing and feeding farm laborers at Blythe, California, from 1953 to 1956 when the corporation became inactive until 1959; (c) the entities described in (a) and (b) formed in 1959, a partnership known as Mission Acres to purchase unimproved land; (d) appellant was president and owner of the controlling stock interest of Pan American Underwriters, Incorporated, which was incorporated in 1955 and engaged exclusively as an insurance agency handling health and accident insurance for agricultural laborers; (e) Rancho Armando, a ranch in Imperial Valley, was incorporated in December 1961 with all its stock owned by Pan American Underwriters, Incorporated; (f) Pan American Underwriters of Arizona was a corporation principally owned by appellant to handle health and accident insurance for agriculture workers in Arizona; (g) Spa Limited created as a sole proprietorship in 1953 operated as a lending institution specializing in chattel mortgages and was actively engaged from its inception until 1961; (h) P.A. F. was a shell corporation which maintained a commercial checking account from 1957 to 1959 in which appellant deposited his personal funds.

Numerous substantial investment contributed to appellant's financial ascendency during the relevant period.

On September 3, 1959, appellant purchased an apartment house in Beverly Hills with a $60,350.00 deposit in escrow; $40,350.00 from the bank account maintained by P.A.F., an inactive corporation; and $20,000.00 comprised of four cashier's checks, each in the amount of $5,000.00 purchased on four consecutive days at four different banks with currency.

In 1960, appellant invested over $40,000.00 in Ellis Middlefield Associates, a joint venture engaged in land development in northern California. In 1961, appellant increased his investment by $25,000.00. This sum of money was comprised of five cashier's checks for $5,000.00 each, purchased at five different banks on the same date. The applications therefor show that four of said cashier's checks were purchased with currency.

In December, 1961, appellant paid $35,000.00 for a half interest in a trust deed on property known as the Kobayshi Ranch, Westmoreland, California.

Commencing in 1957, appellant began buying municipal bonds and as of December 31, 1961, his investment in mucipal bonds totaled $100,589.51.

Corresponding with appellant's increases in his net worth were his investments in stocks other than his closely-held businesses. His investments increased in value from $1,786.60 as of December 31, 1950 to $93,775.81 as of December 31, 1961. Appellant's funds on deposit started at $3.42 on December 31, 1950, and increased to $19,320.31 as of December 31, 1961.

Substantially all the facts concerning appellant's net worth for the relevant years were established by stipulation. Appellant and the government agreed to what assets he owned at the end of each year commencing December 31, 1957, and ending December 31, 1961; that the amounts shown for each asset represented the appellant's actual cost; and that the liability of $80.56 was actually owed a brokerage house in 1960. The only exception to the stipulation was that appellant did not agree to the value of the common and preferred stock other than closely held corporations.[2] The number of shares and actual cost of these stocks were adequately proved by the government, which produced evidence from eight separate brokerage firms and seven transfer agents. In light of the stipulation the trial judge did not feel it necessary for the government to prove independently the items agreed as true in the opening net worth statement; however, he indicated the stipulation did not preclude the appellant from offering evidence to show that there were additional liabilities or from trying to establish that there was additional cash or other assets. The appellant did not offer any evidence in this regard. The Government commenced its investigation of appellant's financial history on December 31, 1950, and showed his annual increase in net worth and nondeductible expenditures during the seven year pre-indictment period.

In support of its case the Government commenced with appellant's net worth as of December 31, 1950 when he had assets less liabilities worth $24,585.84. By December 31, 1957 appellant's net worth had grown to $266,470.58 for an increase of $241,885.00. During this seven year period, he had expended $393,475.33,[3] and this amount of cash expended exceeded his total income reported on his income tax returns by $98,716.62.

During 1958 (the year covered by the first count) his net worth increased from $266,470.58 to $268,794.47 for $1,823.89 gain. This latter sum added to his nondeductible expenditures less the nontaxable receipts, exclusions, and non-cash deductions totaled $62,562.10.[4]

During 1959 (the year covered by the second count) appellant's net worth increased from $268,794.47 to $396,153.45 for an additional amount of $127,858.97. This latter amount added to appellant's nondeductible expenditures less nontaxable receipts, exclusions, and non-cash deductions totaled $138,077.56. After subtracting the six personal exemptions of $3600.00 to which appellant was entitled, he had a taxable income of $134,477.56 compared to the $38,522.15 reported in his 1959 tax return.

During 1960 (the year covered by the third count) appellant's net worth increased $65,627.37 from $396,153.45 to $461,780.82, and when the nontaxable receipts, exclusions, and non-cash deductions are subtracted from the total of the net worth increases and the nondeducti-

---

2. When the stipulation was first presented at the trial, the appellant also took exception to the amount of municipal bonds; however, he subsequently agreed with the government as to this item also.

3. This cash expended for acquisition of assets and income tax for 1951–1957 and personal living expenses for 1953–1957.

4. In 1958 appellant had six personal exemptions totaling $3600.00 which when deducted from the $62,562.10 resulted in the sum of $58,962.10 as taxable income. He reported $50,472.53 or $8,489.52 less.

The trial judge questioned the Government's treatment of a $10,000.00 gift to a trusted employee as a nondeductible item instead of a deductible bonus and expressed a reasonable doubt as to this appellant's guilt on the First Count.

ble expenditures, the net income for 1960 was $60,501.91. Appellant was charged by the Government after deducting his five personal exemptions in the sum of $3000.00 with a taxable income of $57,501.91 as against $48,188.06 or $9,313.85 less than he reported. The trial Court had sufficient doubt as to defendant's wilfulness and acquitted on this count.

During 1961 (the year covered by the fourth count) appellant's net worth grew from $461,780.82 to $513,955.50 for an increase of $52,177.68. This amount and his nondeductible expenses less his nontaxable receipts, exclusions, and non-cash deductions totaled $98,299.29. When the five personal exemptions are deducted, in sum of $3000.00, he had a taxable income of $95,299.23 compared to the $64,125.25 which he reported on his return.

To recapitulate, the computations show that appellant understated his income for 1959 $95,955.41 and underpaid his income tax by $66,195.76, and understated for 1961 his income by $31,172.98 and underpaid his income tax by $20,935.48.

The evidence showed that during the years 1958–1961 the appellant had interests in eight operating businesses and in addition had investments in real estate, a trust deed, a joint venture, and stocks and bonds. His account at the Hill Richards brokerage house indicates that $5,500.00 in currency paid for securities consisted of $100 notes traced from the San Antonio Federal Reserve Bank through a commercial San Antonio Bank to a Mexico City Bank. Within a few months of each bank transaction appellant had in his possession in Los Angeles some of these notes that had been delivered to the Mexico City Bank. The trial court could draw an inference that he had an undisclosed Mexican source of income. United States v. Johnson (1943) 319 U.S. 503, 63 S.Ct. 1233, 87 L.Ed. 1546. While no falsity was disclosed in the books of the corporations, he had no personal books of record except check stubs, some deposit slips, and a looseleaf book relating to his stock sales and purchases. Of great significance is that the appellant's currency transactions totaled $194,725.56 during the indictment years. On one occasion he gave $41,000.00 in currency in an envelope to a business associate at an airport to deposit in escrow to acquire land. Thus, the Government did make a sufficient showing that appellant's disclosed businesses were capable of producing more income than he had reported and that there were irregularities in the bookkeeping. Holland v. United States, (1954) 348 U.S. 121, 75 S.Ct. 127, 99 L. Ed. 731. From this evidence in the instant case the trier of the facts could infer a likely source for " * * * it is well established that the Government need not prove the specific source of proved increases in net worth in order to demonstrate their tax character as income; it is sufficient for it to prove 'a likely source, from which the jury could reasonably find that the net worth increase sprang.' " United States v. Sclafani, 265 F.2d 408, 413 (2nd Cir. 1959), cert. denied in 1959, 360 U.S. 918, 79 S. Ct. 1436, 3 L.Ed.2d 1534; Whitfield v. United States, 383 F.2d 142 (9th Cir. 1967).

The Government produced considerable evidence to negative gifts and inheritances as nontaxable sources. Appellant's brothers were shown to have received loans from appellant, and not have given him any money; his father died leaving no estate; and an uncle bequeathed him $190.00 in 1950. During the indictment period appellant supported his mother. From 1940 to 1950, appellant's wife received $20,000.00 in gifts and 50 shares of American Telephone and Telegraph stock and inherited $3,000.00 from an aunt in 1948. The possibility that these gifts and inheritances of his wife were the nontaxable source was negated by the Government's proof that from 1950 to 1958, appellant expended over $98,000.00 more than reported funds available. Further, appellant never maintained that he saved or accumulated these funds.

Appellant complains that assets of a trust whose beneficiary is his mother were included as part of his net worth

within the category of common and preferred stocks other than closely-held corporations. All of such stock was purchased by appellant with his own funds with the exception of $499.22. Furthermore, appellant reported capital gains transactions for trust stock in his 1961 income tax return. Since the appellant used his personal funds to purchase the stock, the stocks are properly includible in the Government's net worth computation as either an asset or a nondeductible expenditure (gift). The effect on his unreported income is the same.

Appellant complains about the insufficient investigation into his possible liabilities as a source of nontaxable proceeds. The Government showed his indebtedness of $13,474.31 incurred in 1950 for the purchase of a residence and its payment in full in 1954; a note made payable to GMAC in the sum of $510.02 in 1951 was liquidated the same year; and 1960 a liability of $80.54 was liquidated the same year. No leads of loans were furnished by appellant.

Even if all possible nontaxable sources were not negated, the Government would not be required to have done so in light of appellant's "lead" concerning his large expenditures. During the course of the investigation appellant sought in response to Internal Revenue inquiries to furnish an explanation of a nontaxable source of the large sums of currency which were used in his various financial transactions. On June 12, 1962, a Revenue Agent questioned appellant about the source of some of his currency expenditures. Particular reference was made to a $40,000.00 currency transaction in which currency was deposited to P.A.F., Inc., account at the Security First National Bank and also about four $5,000.00 cashier's checks which were purchased with currency by appellant at four different banks on four different days. Appellant explained that he had accumulated currency by withdrawing $500.00 a month from his commercial account at the main branch of the Bank of America in Los Angeles and putting the money monthly in his safe deposit box. The

Government refuted this explanation by showing that during the eleven year period from January 1, 1951, through 1961, the appellant made only twelve withdrawals in the sum of $500.00 for a total of $6000.00. Then the Government produced evidence that appellant's currency expenditures were over $90,-000.00 in 1957; over $20,000.00 in 1958; over $100,000.00 in 1959; over $19,000.-00 in 1960; and over $43,000.00 in 1961. The trial court could clearly find that appellant's explanation of a nontaxable source for large currency transactions was false.

In April 1963 appellant again offered an explanation for his expenditures particularly with reference to the same two currency transactions. The special agent then conducting the investigation was given a "funds statement" prepared by appellant's accountant to establish that appellant's accumulated funds from prior reported earnings constituted a cash reserve which was the source of the later expenditures. For this purpose the statement contained itemizations of receipts and expenditures for the years 1953 through 1957. However, the Government introduced contradictory evidence from which the trial court could find that the "fund statement" was likewise untruthful. Where, as here, the taxpayer advances a specific explanation of the sources of funds expended, the Government need not pursue possible nontaxable sources when the one given is proved false. United States v. Holovachka, (7th Cir. 1963) 314 F.2d 345, cert. denied 1963, 374 U.S. 809, 83 S.Ct. 1695, 10 L.Ed.2d 1033; Gatling v. Commissioner of Internal Revenue, (4th Cir. 1961) 286 F.2d 139; Ferris v. Commissioner of Internal Revenue, (2nd Cir. 1963) 317 F.2d 333.

II.

The record in the instant case has ample evidence from which the trier of fact could infer wilfulness. The buying of four $5,000.00 cashier's checks at different banks on different days, the furnishing of false explanations regard-

ing the source of cash reserves to the agents, the buying of five $5,000.00 cashier's checks at five different banks on the same day, the irregularities in the keeping of personal books, and the large volume of currency transactions comprising approximately $194,725.56 during the indictment period—these circumstances viewed in light of the entire record are sufficient to uphold the trial court's finding of wilfulness and intent to evade and defeat the income taxes due for the years 1959 and 1961.

## III.

■ Finally appellant's statements to the Revenue Agent on June 12, 1962 explaining his currency transactions were properly received in evidence without violation of the Fourth, Fifth, and Sixth Amendments notwithstanding the Agent's failure to warn him of his right to counsel, right to remain silent, and of the possibility that anything he said might be used against him in a criminal proceeding. This issue was resolved in Kohatsu v. United States, 351 F.2d 898 (9th Cir. 1965) cert. denied 384 U.S. 1011, 86 S.Ct. 1915, 16 L.Ed.2d 1017, rehearing denied 385 U.S. 891, 87 S.Ct. 15, 17 L.Ed.2d 122 (1966), followed in Selinger v. Bigler, 377 F.2d 542 (9th Cir. 1967). Appellant's trial commenced December 7, 1965, well before Miranda requirements became effective June 13, 1966. Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); Johnson v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966).

Appellant's attempt to distinguish Kohatsu by his reference to Section 7602 of Title 26 [5] United States Code is without merit; for the Agent was not invoking his powers to compel appellant to appear, to produce records, or give testimony. Here appellant and his accountant voluntarily met in his office with the Revenue Agent.

Nor does the fact that the Internal Revenue Service had an informant's letter suggesting appellant's underpayment of federal income taxes distinguish the instant case. Appellant was not restrained or in custody at the time. Further the examination was made by a Revenue Agent whose responsibilities were concerned with civil tax liability. Not until later was the case referred to a special agent in the intelligence unit for criminal investigation, and after the reference appellant obtained counsel who was present at subsequent conferences. Appellant's specification as error the admission of exhibits obtained by the special agent from appellant with his counsel's permission is groundless.

Accordingly we affirm.

5. § 7602. Examination of books and witnesses.

For the purpose of ascertaining the correctness of any return, making a return where none has been made, determining the liability of any person for any internal revenue tax or the liability at law or in equity of any transferee or fiduciary of any person in respect of any internal revenue tax, or collecting any such liability, the Secretary or his delegate is authorized—

(1) To examine any books, papers, records, or other data which may be relevant or material to such inquiry;

(2) To summon the person liable for tax or required to perform the act, or any officer or employee of such person, or any person having possession, custody, or care of books of account containing entries relating to the business of the person liable for tax or required to perform the act, or any other person the Secretary or his delegate may deem proper, to appear before the Secretary or his delegate at a time and place named in the summons and to produce such books, papers, records, or other data, and to give such testimony, under oath, as may be relevant or material to such inquiry; and

(3) To take such testimony of the person concerned, under oath, as may be relevant or material to such inquiry.