B. L. SHELHORSE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Shelhorse v. Commissioner
Docket No. 7848-77.
United States Tax Court
T.C. Memo 1980-98; 1980 Tax Ct. Memo LEXIS 483; 40 T.C.M. (CCH) 33; T.C.M. (RIA) 80098; March 31, 1980, Filed; As Amended May 15, 1980 Gary L. Bengston, for the petitioner. Ronald P. Campbell, for the respondent. NIMS
MEMORANDUM FINDINGS OF FACT AND OPINION NIMS, Judge: Respondent determined deficiencies in income tax and additions to tax as follows: Additions to Tax Year
Income Tax
Sec. 6653(b) [1]
December 31, 1969
$3,765.52
$1,882.76
December 31, 1970
6,103.76
3,051.88
December 31, 1971
9,723.82
4,861.91
December 31, 1972
6,465.56
3,232.78
*484 The issues for our decision are: (1) Whether petitioner understated his taxable income during the years in issue as determined by respondent using the net worth method of reconstructing income; (2) Whether any portion of the underpayment in tax was due to fraud; and (3) Whether the statute of limitations bars assessment and collection of the deficiencies. FINDINGS OF FACT Some of the facts have been stipulated the are found accordingly. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. Petitioner is a single individual taxpayer who resided in the State of Virginia at the time of the filing of the petition in this case. Petitioner earned Bachelors and Masters degrees at the University of Virginia and Virginia Tech respectively and he received his Doctor of Osteopathy Degree at the Kirksville, Missouri, College of Osteopathic Surgery in 1942. He began practicing medicine in that year and he practiced continuously through the taxable years in issue. *485 During the years in question, petitioner resided and practiced medicine in Imperial, Pennsylvania, where he had moved in 1954 or 1955. Prior to 1968, petitioner utilized a secretary and a bookkeeper in his medical practice, but during the years in issue petitioner kept his own books and he also personally ordered the medicine, drugs and other supplies necessary for his practice. Petitioner had his tax returns prepared by employees of either Auditax, Inc., or H&R Block. Petitioner personally provided to the return preparers all the information used to prepare these returns and the returns accurately reflected all of this information. In October, 1974, Special Agent Paul Shuttleworth of the Internal Revenue Service was assigned to investigate the tax liability of petitioner for the years 1969 through 1973. On October 17, 1974, Shuttleworth and his Group Manager, Billy Whaley, interviewed petitioner with respect to his income tax liability for those years in petitioner's office in Imperial, Pennsylvania. At the interview petitioner was requested to provide the Internal Revenue Service with his financial records for the years 1969 through 1973. He provided only incomplete *486 records for the year 1973 which were contained in a brown paper bag and also patient cards for the years 1973 and 1974. Petitioner told the Special Agents that his other financial records were in Virginia and that he would get them and provide them to the Internal Revenue Service. During the course of the interview, petitioner was asked how much currency he had on hand on December 31, 1968, December 31, 1969, December 31, 1970, December 31, 1971, December 31, 1972 and December 31, 1973 and at any other point in time. Petitioner understood the thrust of these questions and responded that the amount of cash on hand "absolutely" never exceeded $1,000, since he would always make a bank deposit if he ever accumulated more than $400 in cash. Petitioner was aware that the questions were directed to the tax years in issue and not to the date of the interview. Petitioner was also asked about any inheritances he may have received and he told the agents that he had received an inheritance from each of his parents. He stated that the cash he received from his father's estate was expended long before 1967 and the cash he received from his mother's estate in 1971 amounted to approximately *487 $2,000 to $3,000. As to gifts, petitioner told the agents that he may have received several hundred dollars in gifts from grateful patients during any one year. Petitioner could recall no specific loans that he received during the years at issue. Subsequently, petitioner and/or his representatives never made any other records available to the Internal Revenue Service. The records provided to the Service were not sufficient to enable an accurate determination of petitioner's income tax liabilities for the years 1969 through 1973. In the course of the investigation, Special Agent Shuttleworth contacted all the banks, savings and loan and other financial institutions in which petitioner indicated he had an account or other interest and determined that petitioner did not have any outstanding loans at the end of the taxable years. The Dollar Savings Bank of Pittsburgh, Pennsylvania, did indicate that petitioner had taken out two loans during the year 1972, but it advised that both of these loans were repaid before the end of the year. The deductions reflected on petitioner's returns for the years 1969 through 1972 were correct except for a minor deduction for depreciation that *488 was not claimed but has been allowed by respondent. All expenses and deductions claimed on petitioner's returns for the taxable years 1969 through 1972 were allowed in their entirety by respondent in the statutory notice of deficiency. During the taxable years in issue, petitioner had an interest in an investment account (number 0103-0648622) with Investors Diversified Services, Inc., which was held in the form of a revocable trust with his mother, Cora C. Shelhorse, as the beneficiary. At all times during the taxable years in issue petitioner maintained complete control of the assets represented by this investment account, including the right to earn and be paid all cash dividends, the right to vote, sell, redeem, exchange or otherwise deal in or with the stock subject to the investment account, and the right to change the beneficiary or revoke the trust at will. On October 16, 1973, petitioner changed the beneficiary of the revocable trust to his daughter, Helen H. Hunter. Petitioner owned substantial investment real estate during the years at issue. Prior to acquiring each of these properties, including the ones acquired during the period in question, petitioner would consider *489 several different parcels and investigate each parcel's history of income, expenses and occupancy before selecting those to be purchased. Petitioner personally negotiated the purchase of the properties with the owner or real estate agent. A number of petitioner's holdings were farms. In acquiring his numerous farms, petitioner sought and obtained advice from others with regard to the selection and purchase of the farms and he personally investigated each acquisition, taking into consideration several factors, including the location of the farm, its accessibility by highway and its crops. Petitioner personally negotiated the purchase of these farms. After purchasing the property he hired tenant farmers to operate his farms under an arrangement whereby petitioner and the tenant split income and expenses equally. Petitioner required the tenant farmers to provide references prior to employment and he made numerous trips to Missouri to inspect the farms. During the taxable years in issue, petitioner also personally managed some of his apartment buildings, at least part of the time, including collecting rents, renting apartments and making or arranging repairs. Petitioner's medical *490 practice was a thriving practice during the years in issue. At times petitioner had so many patients at his office that as many as 12 to 15 people were lined up outside. At times, too, petitioner had quite a few people waiting in line outside his office to get prescriptions for drugs. The local police chief observed many cars parked in the vicinity of petitioner's office and it was clear to him that these were petitioner's patients because he saw them walk from those cars to petitioner's office. These crowds were not always the best behaved. The police chief's office received complaints from neighbors about fights among the doctor's waiting patients. The computation of petitioner's increase in net worth and understatement of adjusted gross income is as follows: NET WORTH Bodenheimer L. Shelhorse 12/31/68
12/31/69
12/31/70
ASSETS
Cash on Hand
$ 1,000.00
$0
0
Cash in Banks
Dollar Bank-Acct. #618450
3,112.74
12,489.05
6,551.53
Equibank-Acct. #71-6-814244
0
0
1,907.92
Hawthorne Federal-Acct. #28261-4
13,097.17
17,145.84
2,974.60
Hawthorne Federal-Acct. #55138-0
0
0
20,903.04
Trust Co. Bank-Acct. #96-06-03-9
4,223.84
6,817.02
8,693.86
Dollar Bank-Cert. of Deposit
Acct. #503021549
0
0
0
Dollar Bank-Cert. of Deposit
Acct. #503011910
0
0
1,237.06
Dollar Bank-Cert. of Deposit
Acct. #503035168
0
0
0
Dollar Bank-Cert. of Deposit
Acct. #503020628
0
0
20,000.00
Dollar Bank-Cert. of Deposit
Acct. #503032380
0
0
0
First Federal of Carnegie
Acct. #19924
0
0
0
Community Federal
Acct. #77411
8,525.12
12,012.90
12,931.26
Community Federal
Acct. #247122
0
0
0
Community Federal
Acct. #272416
0
0
0
Lynchburg Federal
Acct. #LS-1675-3
0
0
0
Lynchburg Federal Savings
Cert. #4C-200096-1
0
0
0
Bridgeville Trust Co.
558.22
714.33
0
Investments
Investors Diversified Services
Acct. #0103-0648622
3,371.55
3,645.86
3,746.71
Real Estate
50 Acres-Unimproved Real Estate
1,320.00
1,320.00
0
6.39 Acres-Findlay Twp. Pa.
19,500.00
19,500.00
19,500.00
Rental Property-Delaware Dr.
Moon Twp. Pa.
0
0
0
Improvements (Storm Windows)
0
0
0
Rental Property-Juniper Dr.
Moon Twp. Pa.
0
0
0
15.45 Acres-Pittsylvania
County, Va.
10.00
10.00
10.00
6.8 Acres-Davies County, Mo.
340.00
340.00
340.00
15 Acres-Davies County, Mo.
800.00
800.00
800.00
39.28 Acres-Davies County, Mo.
7,000.00
7,000.00
7,000.00
Property-Davies County, Mo.
4,300.00
4,300.00
4,300.00
SUBTOTALS
67,158.64
86,095.00
110,895.98
ASSETS Continued
67,158.64
86,095.00
110,895.98
Subtotals Brought Forward
96.4515 Acres-Florence, Pa.
(1/7 interest)
750.00
750.00
750.00
Residence-Main & Elm Sts.,
Imperial, Pa.
14,000.00
14,000.00
14,000.00
Rental Property-Flat Shoals
Rd., Atlanta, Ga.
30,000.00
30,000.00
30,000.00
15 Acres-Davies County, Mo.
1,500.00
1,500.00
1,500.00
100 Acres-Livingston County, Mo.
3,500.00
3,500.00
3,500.00
188 Acres-Livingston County, Mo.
7,500.00
7,500.00
7,500.00
Pittsburgh County-Downpayment
0
0
0
Automobile
1971 Volkswagen
0
0
0
TOTAL ASSETS
124,408.64
143,345.00
168,145.98
LIABILITIES & ACCUMULATED DEPREC.
Liabilities at end of Year
0
0
0
Reserve for Depreciation on
Rental Property (per return)
32,098.00
36,651.00
40,951.00
Less: Depreciation reserve on Findlay
Pa. Property condemned in 1972
Plus: Unclaimed depreciation on
Juniper Drive Property
TOTAL LIABILITIES & ACCUMULATED
DEPRECIATION
32,098.00
36,651.00
40,951.00
NET WORTH AT YEAR END
92,310.64
106,694.00
127,194.98
INCREASE IN NET WORTH
14,383.36
20,500.98
ADJUSTMENTS TO INCREASE IN NET
WORTH
Additions
Personal Living Expenses
including Food
0
2,914.00
2.914.00
Federal Income Taxes Paid
902.00
1,785.58
Local Wage Taxes Paid
63.62
0
Capital Loss on Sale of Asset
0
0
60.00
Deductions
Nontaxable Portion of Capital
Gain
(88.00)
Nontaxable Gain on involuntary
Conversion
Dividend Exclusion
(98.00)
(100.00)
Distribution from Estate of
Cora B. Shelhorse
Condemnation Proceeds
(Hurt, Va. Property)
(400.00)
Gifts
0
0
0
Total Adjustments
0
3,693.62
4,999.58
CORRECTED ADJUSTED GROSS INCOME
FOR YEAR
18,076.98
24,760.56
Deductions: Personal Exemption
(1,200.00)
(1,250.00)
Standard Deduction
(1,000.00)
(1,000.00)
CORRECT TAXABLE INCOME
15,876.98
22,510.56
Taxable Income Per Returns
5,858.00
9,557.00
UNREPORTED TAXABLE INCOME
10,018.98
12,953.56
*491 12/31/71
12/31/72
ASSETS
Cash on Hand
$0
$0
Cash in Banks
Dollar Bank-Acct. #618450
1,701.49
1.00
Equibank-Acct. #71-6-814244
607.60
(50.63)
Hawthorne Federal-Acct. #28261-4
4,754.58
0
Hawthorne Federal-Acct. #55138-0
22,195.49
20,613.89
Trust Co. Bank-Acct. #96-06-03-9
10,540.96
780.46
Dollar Bank-Cert. of Deposit
Acct. #503021549
10,308.85
10,955.45
Dollar Bank-Cert. of Deposit
Acct. #503011910
1,314.65
0
Dollar Bank-Cert. of Deposit
Acct. #503035168
0
2,577.21
Dolla Bank-Cert. of Deposit
Acct. #503020628
21,254.45
0
Dollar Bank-Cert. of Deposit
Acct. #503032380
16,900.00
17,960.00
First Federal of Carnegie
Acct. #19924
0
9.68
Community Federal
Acct. #77411
0
0
Community Federal
Acct. #247122
3,568.33
0
Community Federal
Acct. #272416
0
6,426.35
Lynchburg Federal
Acct. #LS-1675-3
0
33,559.65
Lynchburg Federal Savings
Cert. #4C-200096-1
0
19,151.54
Bridgeville Trust Co.
0
0
Investments
Investors Diversified Services
Acct. #0103-0648622
3,888.95
4,063.27
Real Estate
50 Acres-Unimproved Real Estate
0
0
6.39 Acres-Findlay Twp. Pa.
19,500.00
0
Rental Property-Delaware Dr.
Moon Twp. Pa.
0
17,969.07
Improvements (Storm Windows)
0
1,800.00
Rental Property-Juniper Dr.
Moon Twp. Pa.
20,331.42
20,331.42
15.45 Acres-Pittsylvania
County, Va.
10.00
10.00
6.8 Acres-Davies County, Mo.
340.00
340.00
15 Acres-Davies County, Mo.
800.00
800.00
39.28 Acres-Davies County, Mo.
7,000.00
7,000.00
Property-Davies County, Mo.
4,300.00
4,300.00
SUBTOTALS
149,316.77
168,598.36
ASSETS Continued
149,316.77
168,598.36
Subtotals Brought Forward
96.4515 Acres-Florence, Pa.
(1/7 interest)
750.00
750.00
Residence-Main & Elm Sts.,
Imperial, Pa.
14,000.00
14,000.00
Rental Property-Flat Shoals
Rd., Atlanta, Ga.
30,000.00
30,000.00
15 Acres-Davies County, Mo.
1,500.00
1,500.00
100 Acres-Livingston County, Mo.
3,500.00
3,500.00
188 Acres-Livingston County, Mo.
7,500.00
7,500.00
Pittsburgh County-Downpayment
0
3,070.00
Automobile
1971 Volkswagen
1,859.70
1,859.70
TOTAL ASSETS
208,426.47
230,778.06
LIABILITIES & ACCUMULATED DEPREC.
Liabilities at end of Year
0
0
Reserve for Depreciation on
Rental Property (per return)
45,049.00
49,064.00
Less: Depreciation reserve on Findlay
Pa. Property condemned in 1972
(7,902.00)
Plus: Unclaimed depreciation on
Juniper Drive Property
383.29
1,149.86
TOTAL LIABILITIES & ACCUMULATED
DEPRECIATION
45,432.29
42,311.86
NET WORTH AT YEAR END
162,994.18
188,466.20
INCREASE IN NET WORTH
35,799.20
25,472.02
ADJUSTMENTS TO INCREASE IN NET WORTH
Additions
Personal Living Expenses
including Food
3,063.00
3,194.00
Federal Income Taxes Paid
3,453.85
5,934.77
Local Wage Taxes Paid
96.52
122.10
Capital Loss on Sale of Asset
0
Deductions
Nontaxable Portion of Capital Gain
(167.00)
(33.00)
Nontaxable Gain on Involuntary
Conversion
(1,293.34)
Dividend Exclusion
(100.00)
(100.00)
Distribution from Estate of
Cora B. Shelhorse
964.28
Condemnation Proceeds
(Hurt, Va. Property)
Gifts
0
0
Total Adjustments
5,382.09
7,824.53
CORRECTED ADJUSTED GROSS INCOME
FOR YEAR
41,181.29
33,296.53
Deductions: Personal Exemption
(1,350.00)
(1,500.00)
Standard Deduction
(1,500.00)
(2,000.00)
CORRECT TAXABLE INCOME
38,331.29
29,796.55
Taxable Income Per Returns
21,010.00
19,355.00
UNREPORTED TAXABLE INCOME
17,321.29
10,441.55
*492 This net worth schedule differs from the schedule contained in the notice of deficiency in the following respects: (1) estimated cost of living figures have been reduced slightly; (2) petitioner was given credit for a $400 condemnation award in 1970 as a nontaxable source; (3) petitioner was given credit for a distribution from his mother's estate in the amount of $964.28 as a nontaxable source in 1971; and (4) petitioner was allowed additional depreciation on rental property for the years 1971 and 1972. These items were all conceded by respondent on brief. ULTIMATE FINDINGS OF FACT
Petitioner had unreported taxable income in the following amounts for the years specified: Year
Amount
1969
$10,018.98
1970
12,953.56
1971
17,321.29
1972
10,441.55
At least part of the deficiency for each of the years 1969, 1970, 1971 and 1972 was due to fraud on the part of petitioner. OPINION Respondent determined deficiencies in petitioner's income taxes for the years 1969 through 1972 using the net worth method of proof. Respondent also determined that petitioner was liable for the fraud penalty under section 6653(b) for these years. *493 In theory the burden of proof is on petitioner with respect to the deficiencies as determined by respondent, Rule 142(a), Tax Court Rules of Practice and Procedure; Welch v. Helvering, 290 U.S. 111, 115 (1933); whereas the burden is on respondent to prove fraud by clear and convincing evidence, section 7454(a), Rule 142(b), Tax Court Rules of Practice and Procedure. However, the notice of deficiency was mailed on April 15, 1977, which is after the expiration of the three-year period of limitations for each of the years but within the six-year period for the years 1970 through 1972. Assessment of the tax deficiency is therefore barred unless respondent affirmatively shows that at least a part of the underpayment of tax was due to fraud in each year, section 6501(c)(1), or that omitted income for the years 1970 through 1972 exceeded 25 percent of gross income, section 6501(e)(1)(A). [2] Since respondent's success in proving fraud turns largely on his ability to affirmatively establish that substantial amounts of taxable income were omitted from petitioner's tax returns for the years in issue, as a practical matter the *494 burden of proof on the income issue also lies with respondent. We will analyze the case from this perspective. There is a three-prong *495 predicate to a prima facie net worth case. Respondent must establish with reasonable certainty: (1) An opening net worth to serve as a starting point in which to calculate future increases in the taxpayer's assets; (2) The amount of increase in net worth from year to year; and (3) That the source of these increases was a taxable source from the current year by either establishing a likely source for the income, or negating all possible sources of a nontaxable income. See Holland v. United States, 348 U.S. 121 (1954) and Massei v. United States, 355 U.S. 595 (1958). In the course of establishing the opening net worth and in negating all possible sources of nontaxable income, the Commissioner must investigate all leads put forward by the taxapyer that are reasonably susceptible of being checked. Holland, at 135-136. Once respondent has met these requirements, the burden of going forward with evidence is shifted to the petitioner. Holland at 138-139. Our inquiry on the income issue is twofold: First, we must determine whether respondent has made out a prima facie net worth case, and second, if respondent meets that measure, we *496 must determine whether petitioner met his burden of going forward with evidence as to specific errors in respondent's determination. Petitioner has attacked respondent's use of the net worth method on two levels. First, he alleges that respondent's failure to secure petitioner's books and records somehow invalidates respondent's determination. Second, he challenges the methodology by which respondent determined two components of the net worth analysis: Petitioner claims that his opening cash on hand was far in excess of the amount credited to him by respondent and he also claims that respondent did not adequately prove the taxable income nature of the increases in net worth. The first argument lends itself to summary disposition. Although there has been some controversy as to who was responsible for respondent's failure to obtain access to all of petitioner's records, we see no need to resolve this dispute. Respondent has no absolute obligation to examine petitioner's records before determining a deficiency via the net worth method of proof; and respondent is also not required to prove *497 the inaccuracy, inadequacy, or unavailability of the taxpayer's records before he can resort to the net worth method, Holland v. United States, supra at 132. [3] As petitioner's actions demonstrate, it would have been idle effort in this case anyway. Petitioner has made no claim that the presence of his records in the courtroom would bolster his case. To the *498 contrary, petitioner steadfastly maintains that his records were accurate, at least on the income side, and that his returns accurately reflected information set forth in the records. Had his claim been otherwise, it might have been expected that petitioner would himself have introduced the records into evidence. He made no such effort. Petitioner's argument on this issue is simply without merit. We turn now to examine petitioner's attack on two components of respondent's determination. Petitioner contends that the opening net worth is inaccurate in that it credits him with only $1,000 in currency cash on hand on December 31, 1968 and not the $38,300 or more that he actually had. He also contends that the respondent did not properly follow leads regarding gifts, inheritances and loans and that respondent has not established a likely source for the income. According to petitioner's testimony at trial, part of the more than $38,300 cash hoard was hidden in a shoe in his basement, part was hidden over the dropped ceiling in the attic and the bulk was buried underground in the basement. Petitioner testified that he considered the money hidden in each of the three locations as *499 a separate account for each of his three children. The proffered reason for this unique form of banking was that the petitioner had lost money in bank failures during the depression and no longer trusted banks. Petitioner alleges that it was not until the 1970's, after his office had been broken into several times and he had been assaulted, that he decided to resort to a more traditional form of protecting his money. Rather than deposit the cash hoard in a bank all at once, petitioner alleged that he deposited small sums in various bank accounts month by month, so that the deposits would look like current income and he would not be audited. [4] Petitioner testified that he then used this money to purchase two buildings for his children. One of the buildings cost $20,000 and the other cost about $17,500 and that is how petitioner claims to know that he had at least a $38,300 cash hoard. [5] (The $800 discrepancy was not explained.) *500 Considering the record as a whole and the demeanor of petitioner as a witness, whom we observed, we find his testimony in this regard unconvincing. It would serve no useful purpose for us to review the record and our analysis of it in detail. We will, however, highlight a few of the more obvious discrepancies. Petitioner's cited reason for hiding money in the basement--because he did not trust banks--is simply belied by the facts. Petitioner would have the Court believe that suddenly during the early 1970's his faith in banks was mystically restored or at least that he decided that banks were a safer bet than his basement. Yet, petitioner was a well-educated man with substantial business acumen who was concerned with earning a return on his investments. He had numerous investments, mostly real property, and many bank accounts during the years in question. Money that he did entrust to banks was often invested in certificates of deposit to earn high interest. In fact, on December 31, 1968, petitioner had five bank accounts with deposits totaling some $29,517.09. Petitioner does not appear to be the type of individual who is likely to keep a cash hoard in the cellar. Moreover, *501 petitioner asks too much when asks the Court to believe on the one hand that conditions got so bad that he was suddenly willing to abandon a 30-to 40-year fear of banks and yet on the other hand that his solution was to dribble small amounts into his accounts over a number of years. A more normal reaction of an individual who suffered through a series of events sufficient to cause him to abandon a position that he had steadfastly clung to all those years would be to deposit the money as quickly as possible. Even if this circumstantial evidence were insufficient, there is more telling evidence that petitioner's tale was a fable. Petitioner explicitly told the Special Agents during the course of their interview that cash on hand "absolutely" did not exceed $1,000 at any point in time and that if he ever had more than $400 he would deposit it into a bank account. We accept these statements as true because they were made before petitioner saw the need to explain the large increases in net worth. He had no motive to lie at the time. Petitioner does not deny that he gave this answer but he assails its probative value on two grounds. Petitioner contends that the Special Agents directed *502 their question to the date of the interview, October 17, 1974, and as of that date, his answers were truthful. However, one of the Special Agents testified that he specifically directed the petitioner's attention to each of the dates December 31, 1968, December 31, 1969, December 31, 1970, December 31, 1972 and December 31, 1973, and he questioned petitioner as to his cash on hand on each of those dates. We have no reason to doubt the Special Agent's credibility on this or on any other issue. Petitioner's counsel also attempted to reconcile the Special Agent's testimony with that of his client by attributing the seeming inconsistency to his client's hearing and alleged memory problems. Petitioner's advanced age and poor health were the cited causes. Considering the record as a whole and our evaluation of petitioner as a witness, we are unwilling to accept that explanation. Two of petitioner's children testified at the trial and both stated that their father told them about purchasing two apartment buildings, one for each of them. Lee Shelhorse also testified that petitioner told him about money hidden in a shoe in the basement; Helen Hunter testified her father told her *503 that he had money hidden in the cellar of his office building. But since neither knew the amount of money that petitioner had stashed away and neither mentioned when petitioner told them the story, their testimony adds nothing to petitioner's case. We therefore sustain respondent's cash on hand determination. The second prong of petitioner's attempt to establish that respondent's net worth method of proof does not meet the requisites of a prima facie case focuses on respondent's effort to establish that the unexplained increase in net worth was due to a taxable source. To establish that the net worth increases resulted from a taxable source, respondent has to either negate nontaxable sources or establish a likely source, not necessarily both. Evidently desiring to have two arrows in his quiver, respondent has presented evidence speaking to both. Petitioner finds fault with each. Petitioner criticizes respondent for not pursuing all leads in negating all other nontaxable sources of income like gifts, loans and inheritances. Petitioner contends that he told the Special Agent that he *504 received numerous cash gifts from his family and his patients and an inheritance from his mother and he complains that the Special Agent made no effort to verify the existence or nonexistence of these gifts. Petitioner also contends the Special Agent did not inquire of the banks where petitioner had money deposited whether those banks had made loans to him. Respondent conceded that petitioner received a $964.28 inheritance from his mother in the year 1971 and stipulated that amount as a nontaxable source. Respondent had no other obligation with respect to that lead. As to the bank loans, petitioner has mischaracterized the import of the Special Agent's testimony. On brief, petitioner cites the Special Agent's testimony that certain specified banks did not furnish him with loan records as proof that those banks were not asked about loans. Obviously, that is a non sequitur. In fact, earlier in his testimony, the Special Agent stated that each of the banks was asked whether or not petitioner borrowed money and we find that testimony credible.It is hard to imagine what records petitioner would have expected from banks that had loaned no money to him. Petitioner suggests that *505 the respondent should have followed up on the lead regarding gifts by using the patient cards to contact petitioner's patients. The record indicates that the respondent had access to patient cards only for years after the years at issue. But even if the Commissioner had had access to the patient cards for the years in issue, this is not the type of lead that the Commissioner would be required to pursue. A taxpayer cannot complain about the sufficiency of an investigation where he has offered no leads or only vague or remote leads, United States v. Penosi, 452 F. 2d 217, 220 (5th Cir. 1972), cert. denied 405 U.S. 1065; Blackwell v. United States, 244 F. 2d 423, 429 (8th Cir. 1957), cert. denied, 355 U.S. 838. This precept is especially apposite where as here the lead could be made more specific if the taxpayer disclosed information uniquely within his knowledge, like the identity of persons who purportedly gave him gifts. In these circumstances we are unwilling to impose upon the Commissioner the highly difficult task of interviewing *506 all of petitioner's former patients. There is perhaps no better indicator of the thorough nature of the investigation conducted by respondent and the adequacy of his investigation of leads than petitioner's inability to show that respondent failed to take into account any nontaxable sources. In addition, any theoretical need for respondent to go beyond leads provided by a taxpayer to negate nontaxable sources has been eliminated in this case by evidence establishing that the one lead provided by petitioner, his cash hoard defense, is false. Feichtmeir v. United States, 389 F. 2d 498, 503 (9th Cir. 1968). We find that respondent's analysis of potential nontaxable sources was sufficient to eliminate the possibility that the increases in net worth were due to nontaxable sources. Even if respondent's efforts in negating nontaxable sources fall below the requisite level, respondent has successfully established that petitioner's medical practice was a likely source of the unexplained increases in net worth. Petitioner takes the position that respondent has failed in this effort. He maintains that he was semi-retired after 1968, citing his lack of employees as evidence *507 thereof. Petitioner's counsel disparages respondent's efforts to prove that petitioner earned the income by being an "easy" source of prescriptions for drugs, characterizing these efforts as "scurrilous attacks on this fine elderly gentleman." Despite these protestations, the record shows that petitioner's medical practice was thriving during the years in question even though he allegedly retired in 1968. The local Chief of Police, Steve Krawchyk, observed as many as 12 to 15 people waiting outside of petitifoner's office at various times. Petitioner admitted that there may have been quite a few people waiting in line outside his office to get prescriptions for drugs at one time or another. Krawchyk also observed many cars parked in the vicinity of petitioner's office and he saw individuals walk from those cars to petitioner's office. These crowds were not always the best behaved.The police chief's office received complaints from neighbors about fights among the doctor's waiting patients. Even petitioner's tax returns belie the story that he was semi-retired. His taxable income as shown on his income-averaging schedules filed with his tax returns steadily increased from a *508 low of $922 for the year 1967, one year prior to his alleged retirement, to a high of $32,918.00 for the year 1973. We see no need to decide whether respondent is correct in asserting that petitioner earned income by being an "easy" source for prescriptions. We only need decide whether petitioner's medical practice was a likely source for the unexplained increases in petitioner's net worth. Evidence that petitioner's medical practice was a thriving practice in the face of petitioner's attempt to convey the impression that his practice could not possibly generate the income alleged is sufficient to support the conclusion that the net worth increases are attributable to currently taxable income derived from the medical practice. All in all, the record shows that respondent conducted a thorough investigation and that his net worth analysis meets the requisites of a prima facie case.
Apart from attacking the methodology, petitioner had several specific complaints about respondent's determination. Since the net worth analysis measures up to the requirements of a prima facie case, the burden of going forward with evidence on these items is on petitioner. Petitioner contends that *509 the borrowed $1500 in 1971 to purchase his 1971 Volkswagen sedan and that he should have been given credit for that amount as a nontaxable source. Petitioner had no independent recollection of the loan. He sought to prove its existence through a handwritten document attached to the bill reflecting that he paid for the car with cash and four checks, one of which was listed as "Dollar Bank Loan. $1500." This handwritten note is in conflict with other evidence regarding the purchase of the Volkswagen. The invoice of sale from Sewickley Sales & Service, Inc., clearly shows that the payment was by check (singular) for $1,859.70, plus the trade-in, and the affidavit of Robert P. Rost, the owner of Sewickley Sales & Service, Inc., states that "Bodenheimer L. Shelhorse paid $1,859.70 by check on November 12, 1971, for the cash balance of the purchase" (emphasis supplied). We doubt that the invoice would have contained such language had petitioner actually paid the balance by three or four checks plus cash as he alleges. In addition petitioner introduced absolutely no evidence that the loan he purportedly obtained during 1971 was outstanding on December 31st of that year. The Special *510 Agent contacted every bank or other financial institution known to have had dealings with petitioner during the taxable years in issue and was advised that there were no outstanding loans to petitioner at the end of any of these taxable years. [6] We conclude that petitioner has not met the burden of proving that he should be given credit for a $1,500 nontaxable source. Petitioner finds fault with respondent's estimated cost of living figures because they were predicated on Bureau of Labor statistics tables that contained no information for individuals over 65 years of age and because no adjustments were made to these estimates to reflect petitioner's frugal lifestyle. Cost of living estimates are an inexact measure of a taxpayer's expenditures, but this lack of precision does not preclude *511 their use, Giddio v. Commissioner, 54 T.C. 1530, 1532 (1970). Respondent's only obligation is to take a reasonable approach under all the facts and circumstances. Since the table contained figures only up to age 65, it was not unreasonable for respondent to use the age 65 figures. [7] Indeed, the approximately $3,000 per year personal living expenses attributed to him by respondent was if anything a conservative estimate in view of the amount of income actually earned by the petitisoner. The burden is thereby shifted to petitioner to introduce probative evidence as to his living expenses. Vague and unsubstantiated statements about eating out a lot at patient's homes, eating out of the vegetable garden, not recalling buying any household goods or more than a couple of articles of clothing, do not suffice. More concrete evidence *512 of petitioner's actual expenses is required to overcome respondent's determination. Reconstructing living expenses may be difficult but petitioner is the one most able to do it. Petitioner's failure to make any effort in this regard means that respondent's determination must stand. [8]
Petitioner's final contention on the income issue is that he should be given credit as a nontaxable source for the several thousand dollars per year in gifts he received from grateful patients and family.Once again we see no need to review the evidence in the record on this point at length. Petitioner's testimony with respect to the gifts was vague and completely *513 unsubstantiated. If petitioner's patients were grateful enough to give him gifts in the thousands of dollars, they certainly would have been gracious enough to have testified to that effect at trial. No such evidence was adduced by petitioner and we find his story of receiving thousands of dollars in gifts from patients not worthy of belief. In those limited instances where we might be inclined to believe petitioner's story about receiving unsolicited payments from patients, it is clear that the payments were given to petitioner in connection with services he performed for them. For example, petitioner testified that he received several payments from an Allegheny Airlines pilot whom he was treating and advising as to how me might requalify physically as a pilot. Petitioner also testified that he received payments from the sister of a man (who was not identified) who had cut his hand with an ax and had been treated and referred to a hospital by petitioner. And petitioner testified that he received payments from Robert Pirro, who was in an automobile accident and had been treated by petitioner. Without the testimony of the persons involved in these alleged gifts, it is difficult *514 to determine their motive in making the payments to petitioner. However, on the available evidence, it seems apparent that the payments were in fact made in return for and with regard to services performed by petitioner and were not made with the detached generosity required to qualify the gift as nontaxable. Commissioner v. Duberstein, 363 U.S. 278 (1960). The only palpably specific testimony dealt with gifts from family. Petitioner stated "I - as I remember, I said that I'd - I had acquired - if I remember right, it was $1,800.00" from "… mostly relatives, I believe" at Christmas time, 1969. However, petitioner could not remember whether this amount was in cash or checks or both. Also, petitioner, when asked on cross examination whether the amount was $1,800.00, stated that: It was something like that. That's approximate. I'm not too sure about the exact figure on it. We think it is more than coincidence that the only persons petitioner could identify as having been donors of the alleged gift, his mother and his brother Albert, are deceased and, thus, unavailable to confirm or deny the allegation. Petitioner offered no reason why his family would *515 have given him such a large sum, when his net worth on December 31, 1969, as determined by respondent was $106,694.00. This was likely a very conservative figure since all noncash assets are listed at their original cost rather than their current market value.The final accounting of the estate of Cora C. Shelhorse, petitioner's mother, indicates that at her death in 1971 her estate was very modest. In the final analysis petitioner has not met his burden of proving that he received gifts. [9]
Respondent's use of the net worth method is thus sustained. Through this method of proof, respondent has affirmatively established that petitioner omitted substantial amounts of taxable income and income due thereon on his tax returns for the years 1969 through 1972. It is clear that omitted income in each year exceeded 25 percent of gross income *516 and thus the notice of deficiency was timely vis-a-vis the years 1970-1972 because it was filed within the six-year period of limitations, section 6501(e)(1)(A). [10]
For purposes of both the fraud penalty and section 6501(c)(1), the fraud exception to the three-year statute of limitations, the remaining question is that of petitioner's intent. The evidence that the understatement of taxable income and income tax due thereon was due to fraud is overwhelming in this case. It is clear that these omissions were not the product of inadvertence, negligence or gross negligence. All these possibilities have been accounted for by the evidence adduced at trial. Petitioner kept his own records, so there is no bookkeeper to blame; the returns were an accurate reflection of these records, so there *517 is no tax return preparer to blame; the dollar amounts omitted were large and the omission occurred over a successive period of years, so oversight cannot be blamed. Any doubt on this issue of intent is quickly put to rest by respondent's proof that petitioner's medical practice was capable of generating substantial income despite petitioner's protestations to the contrary and by petitioner's completely incredible stories about the cash hoard hidden in the basement and thousands of dollars of gifts from grateful patients. We are thus inexorable driven to the conclusion that petitioner voluntarily and intentionally omitted substantial amounts of taxable income from his tax returns with knowledge that these amounts should have been reflected thereon. That is the gravaman of tax fraud.See Considine v. Commissioner, 68 T.C. 52, 59-61 (1977)
Petitioner has sought to establish his lack of fraudulent intent through the testimony of several character witnesses. This generalized testimony as to petitioner's reputation in the community is not sufficient to overcome the hard evidence presented in this case that the understatement of taxable income and the taxes due thereon *518 was due to fraud. Due to minor adjustments in the net worth statement made by respondent on brief, Decision will be entered under Rule 155. Footnotes
1. Unless otherwise provided, all section references are to the Internal Revenue Code of 1954, as amended, and in effect during the years in question.↩
2. Petitioner contends that respondent's failure to raise section 6501(e)(1)(A) in the notice of deficiency means that it is not a factor in this case. Presumably, he would make the same argument with respect to section 6501(c) as well. The latter section was raised for the first time in the Answer; the former section was raised for the first time in an Amendment to Answer which was filed pursuant to leave granted by the Court. This argument is without merit. The statute of limitations need not be addressed in the notice of deficiency. Whether the time limit expired prior to the mailing of the statutory notice of deficiency is a question which must be raised by the taxpayer. See Rice v. Commissioner, 295 F. 2d 239 (5th Cir. 1961), affirming per curiam, T.C. Memo. 1960-155; Rule 40, Tax Court Rules of Practice and Procedure.↩
3. Petitioner finds unwarranted solace in citing Talley v. Commissioner, 20 T.C. 715 (1953), for the proposition that proof of error in the taxpayer's books and records is a necessary predicate to the net worth method.The short answer to petitioner is that Talley predated Holland v. Commissioner, 348 U.S. 121 (1954), where the Supreme Court rejected such a rule. But Talley↩ can be distinguished factually as well. There, the taxpayer was on the completed contract method of accounting which by its nature does not match up well with a net worth analysis. It is in that context that we required the Commissioner to establish that there were errors or omissions in the taxpayer's books. Such an argument is unavailable to a cash basis taxpayer like petitioner.
4. On brief petitioner contends that the reason for the gradual deposits was that the petitioner did not want to risk carrying all the money at one time, citing Tr. p. 164. There is no testimony to that effect in the record. ↩
5. Petitioner does not allege that the additional monies in his cash hoard were the actual monies used to buy the two buildings. Rather, he alleges that he maintained a sort of notional account in his mind and that he set aside certain amounts in his mind as belonging to each of his children. Therefore, though the actual monies to purchase the buildings may have emanated from a different account than the account in which he deposited the currency, he alleges that he works it all out in his head.↩
6. The two loans that were discovered to have been obtained by petitioner, in the amounts of $11,277.57 and $3,000 from the Dollar Savings Bank during the taxable year 1972, were both completely repaid prior to December 31, 1972. Thus, these loans have no effect whatsoever on petitioner's net worth.↩
7. Any difference would be nominal anyway. Estimated expenses for an individual in the 35-54 age group are 38 percent of the basic budget for a family of four; estimated expenses for an individual in the 56-64 age group are 33 percent of that same figure; estimated expenses for an individual petitioner's age cannot be far behind.↩
8. On brief, petitioner makes the somewhat cryptic statement that he has been charged twice with transportation expenses. We assume petitioner means that charging him with purchasing an automobile in 1971 and with estimated Bureau of Labor transportation expenses in the same year is duplicative. However, we find that the $300 estimated transportation expenses charged to petitioner is not an unreasonable estimate of petitioner's expenses for the year over and above the cost of the car and we decline the invitation to make an adjustment.↩
9. During the course of this case, petitioner contended that other adjustments in the net worth statement were appropriate. We take petitioner's failure to press these arguments on brief as a concession by petitioner on these issues.His decision in this respect is understandable since these arguments were either irrelevant or without merit.↩
10. Petitioner argued that since the notice of deficiency was mailed exactly six years after the April 15, 1970, date of the 1971 tax return, the notice could not be considered timely under section 6501(e)(1)(A) because it was not filed "within six years." That argument was rejected by the Supreme Court in Burnet v. Willingham Loan and Trust Company,282 U.S. 437↩ (1931).