HERBERT M. STEPHENS AND BARBARA K. STEPHENS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Stephens v. Commissioner
Docket No. 9831-78.
United States Tax Court
T.C. Memo 1984-449; 1984 Tax Ct. Memo LEXIS 223; 48 T.C.M. (CCH) 938; T.C.M. (RIA) 84449; August 27, 1984. Herbert M. Stephens and Barbara K. Stephens, pro se. Beth L. Williams, for the respondent. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent determined the following deficiencies in and additions to petitioners' Federal income taxes: Year
Deficiency
[1] Sec. 6653(b) 1972
$29,293.03
$14,646.51
1973
23,031.55
11,515.78
1974
34,239.53
17,119.77
Issues relating to the deficiencies having already been disposed of, as indicated below, entry of decision was deferred pending resolution of the issues *224 relating to respondent's imposition of the fraud addition. The issues remaining for decision are: (1) whether petitioners are liable for the section 6653(b) fraud addition with respect to their 1972, 1973, and 1974 taxable years, and (2) whether the statute of limitations bars assessment of the deficiencies and additions to tax for any of those taxable years. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, first supplemental stipulation of facts, second supplemental stipulation of facts, and exhibits attached thereto are incorporated herein by this reference. In addition, by order dated December 5, 1979, specified affirmative allegations of fact set forth in respondent's answer to the amended petition and the amendment to amended petition filed herein were deemed admitted pursuant to respondent's motion under Rule 37(c), Tax Court Rules of Practice and Procedure, and are incorporated herein. Also, by orders dated December 8, 1980 and January 26, 1981, which relate *225 in detail the convoluted prior history of this case, those issues relating to the deficiencies asserted herein and as to which petitioners bore the burden of proof were dismissed by the Court for failure properly to prosecute. Rule 123(b), Tax Court Rules of Practice and Procedure.
Petitioners Herbert M. Stephens (Mr. Stephens) and Barbara K. Stephens (Mrs. Stephens), husband and wife, resided in Sault Ste. Marie, Michigan, when they filed the petition herein and also when they filed the amended petition and amendment to the amended petition. Petitioners filed joint U.S. Individual Income Tax Returns (Forms 1040) for each of the years 1972, 1973, and 1974, [2] using the cash receipts and disbursements method of accounting. Petitioners had five children who were *226 born prior to the years at issue herein and two more born during these years. The children lived in petitioners' household at all times during the years before the Court. Mr. Stephens received a Bachelor of Science Degree from Western Michigan University and also studied one year of accounting at Bob Jones University. Petitioners began buying motels in 1962. During the years 1972 through 1974, petitioners were in the business of operating motels as sole proprietorships and as partners with third parties. During these years petitioner owned and operated the following motels as sole proprietors: International Motel (International) Commodore Motel (Commodore) Airport Motel (Airport) Petitioners were also partners in the operation of the following motels in these years: Skyline Motel King Motel (a/k/a Crown Motel) Viking Motel Aquarama Motor Lodge (a/k/a Pine Shores, Inc.) Mr. Stephens had a 50 percent interest in the Skyline and Viking Motels and a one-third interest in Aquarama. [3]
*227 Petitioners purchased the King Motel on February 16, 1967, by a land contract from Alton King (Mr. King) at a cost of $300,000. By December 31, 1970, petitioners had reduced the principal on the land contract only to the amount of $267,476.74. Mr. King obtained a judgment against Mr. Stephens in December 1971 in the amount of $300,000, which amount included the unpaid balance owing on the land contract together with interest thereon. Mr. Stephens and Mr. King reached a settlement of that judgment in December 1971. Pursuant to their settlement, Mr. King received $285,000 from petitioners in satisfaction of the judgment. The $285,000 used by petitioners to pay off the land contract was borrowed from Paul Johnson (Mr. Johnson). In return for the loan, petitioners deeded a one-half interest in the King Motel to Mr. Johnson on December 14, 1971. The King Motel, also known as the Crown Motel, was conducted as a partnership by Mr. Stephens and Mr. Johnson from December 14, 1971 and throughout the three years before the Court. Mr. Stephens maintained the book ofs the partnership and prepared the partnership returns. During the years 1972 through 1974, petitioners derived substantial *228 income from the operation of the various motels. Mr. Stephens personally managed the Commodore until the spring of 1975, subsequent to the years here at issue. During the years 1971 through 1974, petitioners also personally managed the International and had their personal living quarters there. Mrs. Stephens was actively involved in the day-to-day operations of the International. When guests registered at the three motels operated and personally managed by petitioners, they were asked to complete registration cards that indicated, inter alia, the type of room rented and the rental charge. No other entries as to rental income were made in any type of daily ledger book. At some point in time, monthly summaries were purportedly made from the registration cards, purporting to reflect the total gross receipts for a particular month for the Commodore, International, and Airport Motels, respectively. These monthly summaries were entered in a spiral notebook. The monthly summaries consisted of entries of total amounts pertaining to the categories "room," "use tax," "wages," "S.T." (sales or state tax), and sometimes "rest." (restaurant). Each month was recorded on a separate page. *229 The monthly entries for each category were separately set forth for the Commodore, International, and Airport; then the three were totalled into one combined figure. The monthly summaries contain no reference to, or reconciliation with, any records of original entry for the recording of motel receipts. Mr. Stephens personally maintained these monthly summaries of the Commodore, International, and Airport and used them in preparing petitioners' joint income tax returns. [4]
In the daily conduct of the motel businesses that petitioners personally managed, Mr. Stephens often used cash receipts from these motels to discharge various expenses incurred in their operation. No record of these cash disbursements was maintained. During the years in issue, petitioners also engaged in numerous *230 real estate transactions. In addition to purchasing additional real estate, petitioners also sold numerous parcels held by them primarily for sale. Mr. Stephens used cash receipts from the motel businesses and also negotiated small-denomination checks received from motel customers to make down payments on various parcels of the purchased real estate. During the years in issue, petitioners maintained accounts at numerous banks in the Sault Ste. Marie, Michigan area, but petitioners dealt extensively in cash transactions, During the course of the audit herein, petitioners repeatedly told respondent's agents that all net receipts after cash payouts from the Commodore, International, and Airport were deposited in these accounts. Petitioners' statements were false. Mr. Stephens told the IRS agent that in April of 1974, he and his wife began to experience problems in dealing with these banks, [5] and then opened a savings account with the Imperial Bank of Commerce in Sault Ste. Marie, Ontario, and began to deposit some receipts of the motels into that account. [6] This savings account was not petitioners' primary commercial account. Instead, petitioners maintained an account at the *231 Royal Bank of Canada which served as their primary commercial account. During 1975, petitioners instructed two of their young male children to deposit relatively large amounts of cash from a paper bag into a Canadian bank. This was an attempt to hide assets and taxable income from the years 1972 through 1974. On February 26, 1973, Mr. Stephens sold timber on certain realty he owned to the Kimberly-Clark Corp. for $16,000. In March of 1973, Kimberly-Clark Corp. issued a check to Mr. Stephens in payment of the purchased timber. Petitioners did not include any of this amount as income on their 1973 joint return. During the years 1971 through 1973, inclusive, Mr. Stephens filed financial statements with various banks. These financial statements showed that Mr. Stephens' total net worth was increasing over this period of time. According to his own financial statements, Mr. Stephens' net worth *232 increased from approximately $475.090 to $1,213,341, or an increase of approximately $738,000, in the period from September 1, 1971 to December 31, 1973. On their 1972, 1973, and 1974 joint returns, petitioners claimed losses each year in the amounts of ($43,859.08), ($75.08), and ($18,208.38), respectively. Petitioners repeatedly informed respondent's agents that they had reported all of their income for the years at issue. Petitioners' statements were false. Utilizing the net worth expenditures method of reconstructing income, respondent determined that petitioners had understated their income for 1972, 1973, and 1974 in the amounts of $124,710.95, $69,829.10, and $108,090.48, respectively, as follows: ASSETS:
DEC. 31, 1971
DEC. 31, 1972
DEC. 31, 1973
DEC. 31, 1974
Cash on hand
$ 5,000.00
$ 5,000.00 $ 5,000.00 $ 5,000.00 Cash in banks
14,096.80
10,561.90 13,087.17 7,285.01 Loans
1,302.64 1,302.64 1,302.64 Receivable
Stocks & Bonds
5,918.19
5,918.19 5,918.19 5,918.19 Mach. & Equip.
45,666.00
40,986.00 66,406.00 77,406.00 Other
14,372.85
14,706.85 22,186.85 22,186.85 Depr. Assets
Real Estate
1,695,700.00
1,852.950.00 2,080,550.00 2,223,081.68 Motel
46,128.36
45,128.36 50,092.36 50,092.36 Furniture & Fix.
Partnership
34,444.63
64,892.47 51,996.66 43,636.36 Inter.
Land
4,000.00
34,800.00 33,000.00 72,771.23 Contract Rec.
TOTAL ASSETS
$1,865,326.83
$2,077,246.41 $2,329,539.87 $2,508,680.32 LIABILITIES: Land Contracts
Payable
$1,003,143.76
$1,077,365.27 $1,172,196.36 $1,212,340.47 Mortgages
12,679.03
26,311.86 52,563.39 55,732.47 Payable
Notes Payable
47,861.19
22,911.33 12,022.08 9,808.63 Installment
Loans Payable
8,909.44
21,041.67 24,340.99 13,379.34 Reserve for
Depreciation
223,241.26
291,567.26 372,909.01 447,748.27 TOTAL
LIABILITIES
$1,295,834.68
$1,439.197.39 $1,634,031.83 $1,739,009.18 NET WORTH
$ 569,492.15
$ 638,049.02 $ 695,508.04 $ 769,671.14 LESS: NET WORTH
End of Preceding
Year
$ 569,492.15 $ 638,049.02 $ 695,508.04 Increase
in Net Worth
68,556.87 57,459.02 74,163.10 Add: Personal Living
Expenses
12,295.00 12,295.00 15,719.00 Adjusted Gross
Income
80,851.87 69,754.02 89,882.10 Adjusted
Gross Income
Reported
(43,859.08)
(75.08)
(18,208.38)
Understatement
of Income
$ 124,710.95 $ 69,829.10 $ 108,090.48 *233 In the above net worth computations, the parties have stipulated to all of the items listed as liabilities and to all of the items listed as assets except cash on hand, loans receivable, and stocks and bonds. Petitioners, as of December 31, 1971, did not own, possess, or have on hand any receipts, accumulations, funds, or other assets having a cost basis to them in an aggregate amount exceeding $569,492.15. During the years in issue petitioners owned some 62 parcels of real estate. Throughout the entire audit petitioners specifically denied the existence of any cash hoard. Each item included in the net worth computation was documented by respondent's agents during the audit, and no competent evidence was produced at the trial to show error in any of these items. The reserve for depreciation as of December 31, 1971, takes into account the depreciation attributable to all prior years for the assets included in petitioners' net worth. Petitioners' personal living expenses were calculated from Bureau of Labor statistics using an intermediate budget with a family of six or more persons and the household head under 35 years of age. Petitioners, during the taxable years 1972 to *234 1974, did not borrow or receive from nontaxable sources any funds or other assets not properly taken into account by respondent. All leads as to nontaxable sources were investigated by respondent's agents through third-party contacts. Throughout the course of the audit, Mr. Stephens repeatedly told respondent's agents that he would produce complete records of his motel businesses, real estate transactions, and bank accounts, including daily receipt records from the motel businesses. Petitioners failed to maintain or submit for examination complete books or records of their income-producing activities for the years at issue. No records of original entry were ever produced either during the audit or during the pendency and trial of this case. Specifically, no daily receipt records of the motel businesses were ever produced. No registration cards for any of their motel businesses were ever produced. No records of original entry from which motel receipts could be verified were ever produced. The monthly summaries are the only records of motel receipts produced by petitioners at any time. Petitioners failed to cooperate with respondent's agents during the audit and repeatedly *235 delayed and misled the agents. Petitioners also failed to cooperate with respondent's counsel and their own counsel, two different groups of their attorneys being forced to move to withdraw from the case because of petitioners' failure to cooperate. Petitioners' failure to cooperate with their own counsel made it impossible for their counsel to comply with the Court's pretrial orders. Petitioners themselves consistently ignored or failed to comply with the Court's orders. ULTIMATE FINDINGS OF FACT
1. Petitioners had no cash hoard on December 31, 1971, or at any other time pertinent to this case. 2. Petitioners' motel businesses were a source of ready cash that petitioners "skimmed" and never reported as income. 3. Petitioners understated their taxable income and underpaid their taxes in each of the years 1972 through 1974. 4. The underpayment of tax each year was due to fraud with intent to evade tax on the part of both petitioners. OPINION Petitioners' liability for the underlying deficiencies herein having been previously established by this Court's earlier orders, [7] the primary issue remaining for decision concerns petitioners' liability for the section *236 6653(b) fraud addition. Resolution of the fraud issue in respondent's favor will dispose of any issue concerning the statute of limitations. Sec. 6501(c)(1). *237 Section 6653(b)(1) provides, in part, that "If any part of any underpayment * * * of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment." The fraud addition under section 6653(b) presupposes the existence of an underpayment. Absent an underpayment, there is nothing to which the fraud addition may attach. See Jenkins v. United States,313 F. 2d 624, 627 (5th Cir. 1963). [8] Consequently, the existence of an underpayment is an element of the fraud that respondent must establish. [9] Under the terms of section 6653(b), the fraud addition attaches to the entire underpayment even though only a portion thereof is due to fraud. Mensik v. Commissioner,328 F. 2d 147, 150 (7th Cir. 1964), cert. denied 389 U.S. 912 (1967), affg. 37 T.C. 703 (1962); Johnson v. United States,94 Ct. Cl. 345, 39 F. Supp. 103 (1941). See also Breman v. Commissioner,66 T.C. 61 (1976); Stewart v. Commissioner,66 T.C. 54 (1976). *238 Respondent determined an underpayment herein using the net worth-expenditures method of reconstructing income. Respondent, in support of his allegations of fraud against petitioners, specifically incorporated this net worth computation in his answer to the petition. Under this Court's Rule 37(c) order, the items included in and the results of respondent's net worth computation have been deemed admitted by petitioners. Such deemed admissions alone would be sufficient to carry respondent's burden of proof as to this and the other elements of fraud in this case. Doncaster v. Commissioner,77 T.C. 334 (1981) (Court reviewed). However, even absent these deemed admissions, respondent's net worth analysis is sufficient to carry his burden as to the existence of an underpayment herein. The net worth-expenditures method is an acceptable mechanism for testing the accuracy of a taxpayer's returns, but its use requires the exercise of "great care and restraint." Holland v. United States,348 U.S. 121, 129 (1954). See also United States v. Massei,355 U.S. 595 (1958). Under Holland, in order to validate its claim that increases in *239 net worth are due to unreported income, the Government must establish, with reasonable certainty, an opening net worth, annual increases in net worth, and that the increases were from taxable sources of income. To meet this latter requirement, respondent either must have conducted a reasonable investigation of leads negating possible sources of nontaxable income or must have established a likely source of unreported taxable income. Respondent's determination of petitioners' net worth in this case was based on information obtained by respondent's agents during the various interviews conducted during audit and from contacts with third parties to verify such information. Respondent's agents obtained documentation as to each item included in the net worth computation. Indeed, except as to three of the asset items, all items included in respondent's entire net worth computation have been stipulated to by petitioners. The only three items unstipulated are cash on hand, loans receivable, and stocks and bonds; only cash on hand is a significant item, and it becomes significant only because of petitioners' belated claim of a "cash hoard" to try to increase their opening net worth. [10] *240 The only challenge petitioners make to respondent's opening net worth is *241 to claim the existence of a "cash hoard." Petitioners presented this claim for the first time at trial, after having repeatedly denied the existence of a cash hoard throughout the entire audit and pretrial stages. Petitioners now claim they had some $185,000 stashed away in a one gallon paint can which was hidden in an oil house located near a cabin they owned. This money was allegedly the product of depreciation deductions claimed in years preceding those now in issue. Petitioners also claim that their fears for their personal safety if the existence of the alleged cash hoard became known prevented earlier disclosure to respondent's agents. The Court did not believe petitioners' explanation for their tardy "revelation," nor their tale of a cash hoard, finding the testimony of both spouses wholly unworthy of belief. Quite apart from the fact petitioners have been deemed to admit they had no cash hoard by virtue of our Rule 37(c) order, their claim of a cash hoard funded by depreciation deductions is inherently incredible. Succinctly stated, depreciation deductions do not generate actual cash in hand that can be used to fund a cash hoard. Petitioners' contention to the contrary *242 is utterly fanciful. [11] Petitioners simply could not have accumulated a cash hoard in the manner claimed. [12]
*243 Furthermore, the objective facts of record negate the existence of petitioners' purported cash hoard. In particular, we note that petitioners borrowed $285,000 from Mr. Johnson in late December 1971, and used the funds to settle an outstanding judgment against them. Petitioners then deeded a one-half interest in one of their motels to Mr. Johnson to satisfy this debt. We simply do not think such conduct is likely of one actually possessing a cash hoard of the size alleged by petitioners. Evidence of extensive borrowing is a factor strongly indicating the absence of a cash hoard. See Davis v. Commissioner,239 F. 2d 187, 190 (7th Cir. 1956). [13]
From the above, we think it is clear that respondent has established petitioners' opening net worth and the increases in their *244 net worth with reasonable certainty. Thus, this portion of the Holland test is met.Respondent must also establish either that a likely source of unreported income existed or that he conducted a reasonable investigation of leads reasonably susceptible of being checked to negate the existence of nontaxable sources of income, but respondent need not do both. United States v. Massei,supra.[14] In our opinion, although not required to, here respondent has done both. Respondent has established that the receipts from the Commodore, International, and Airport Motels were a likely source of unreported income.Cash receipts were used to discharge operating expenses of the motels and no records of the amounts of such cash payments were maintained. Furthermore, petitioners used cash receipts and also endorsed checks received in operation of the motels as down payments for their real estate purchases during the years in issue, again without maintaining records as to the amounts so used. The grossly inadequate records maintained by petitioners could not be used to verify that all receipts from these motels were reported as income. On the contrary, the record shows *245 that petitioners did not deposit all net receipts in their bank account, as they told respondent's agents they did. The inference is almost overwhelming that the motel receipts represented a source of unreported income. The record also clearly indicates that respondent conducted a reasonable investigation of leads to negate the existence of nontaxable sources of income. Respondent's agents methodically verified through third-party interviews all of the information given to them by petitioners as to nontaxable sources of income. At trial, petitioners for the first time claimed the existence of additional loans from third parties. No competent documentary evidence of such alleged loans was produced. The third parties who allegedly made these loans to petitioners were not called as witnesses. Mr. and Mrs. Stephens' own testimony as to these alleged loans was confusing, inconsistent, and wholly unworthy of belief. The Court is convinced that these alleged additional loans did not exist. Since the Holland standards have been fully met, respondent's net worth analysis is valid evidence that petitioners *246 underreported their income for each of the years in question. There is no evidence that the increases in their net worth were attributable to any nontaxable sources of income and the Court is satisfied that the increases were attributable to unreported income from the motel operations. Respondent has carried his burden of proving the existence of an underpayment in each of the years in issue by clear and convincing evidence. Aside from respondent's net worth computation, other evidence in the record supports our conclusion that petitioners underpaid their income tax for their 1973 taxable year. It is undisputed that petitioners received $16,000 from the Kimberly-Clark Corp. in that year as payment for their timber. Such amount should have been, but was not, reported as income. Thus, at least for petitioners' 1973 taxable year, the evidence demonstrates an underpayment of tax independent of respondent's net worth analysis. We must next determine whether such underpayment of tax for each year was due to fraud within the meaning of section 6653(b). The fraud envisioned by section 6653(b) is actual, intentional wrongdoing, and the intent required is the specific purpose to evade *247 a tax believed to be owing. Candela v. United States,635 F. 2d 1272 (7th Cir. 1980); Stoltzfus v. United States,398 F. 2d 1002, 1004 (3d Cir. 1968), cert. denied 393 U.S. 1020 (1969); Mitchell v. Commissioner,118 F. 2d 308 (5th Cir. 1941), revg. 40 B.T.A. 424 (1939), followed on remand 45 B.T.A. 822 (1941); Wilson v. Commissioner,76 T.C. 623, 634 (1981). Respondent must show that the taxpayer intended to evade taxes by conduct calculated to conceal, mislead, or otherwise prevent collection of such taxes. Stoltzfus v. United States,supra,398 F. 2d at 1004; Webb v. Commissioner,394 F. 2d 366, 377 (5th Cir. 1968), affg. a Memorandum Opinion of this Court; Acker v. Commissioner,26 T.C. 107, 112-113 (1956). Fraud is a factual question to be determined on the basis of the entire record. Mensik v. Commissioner,supra,328 F. 2d at 150; Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion 578 F. 2d 1383 (8th Cir. 1978); Otsuki v. Commissioner,53 T.C. 96, 105-106 (1969). *248 Fraud can seldom be established by direct proof of the taxpayer's intention; therefore, the taxpayer's entire course of conduct must be considered and fraudulent intent can be established by circumstantial evidence. Spies v. United States,317 U.S. 492 (1943); Gajewski v. Commissioner,supra,67 T.C. at 200; Stone v. Commissioner,56 T.C. 213, 223-224 (1971); Otsuki v. Commissioner,supra,53 T.C. at 105-106. Respondent must prove fraud in each of the years involved. Drieborg v. Commissioner,225 F. 2d 216, 220 (6th Cir. 1955). Furthermore, fraud is not imputed from one spouse to another; in the case of a joint return, respondent must prove fraud on the part of each spouse. Sec. 6653(b)(4); Hicks Co. v. Commissioner,56 T.C. 982, 1030 (1971), affd. 470 F. 2d 87 (1st Cir. 1972); Stone v. Commissioner,supra,56 T.C. at 227. Under our order granting respondent's motion under Rule 37(c), Tax Court Rules of Practice and Procedure, detailed specified allegations of fact contained in respondent's answer have been deemed admitted by petitioners. *249 In addition to the underlying allegations of primary facts, the deemed admissions also included the allegations that petitioners underpaid their taxable income for their 1972, 1973, and 1974 taxable years and that such underpayments were fraudulent with intent to evade tax. These deemed admissions alone are sufficient to satisfy respondent's burden of proof as to fraud. Doncaster v. Commissioner,supra,77 T.C. at 337 and cases cited therein. However, even absent these deemed admissions, there are other indicia of fraud that sustain respondent's burden in this case. As to the receipts from the motel operations, the only records of such receipts maintained by petitioners were certain monthly summary totals. No daily receipts record of any sort was maintained. Expenses of the motel businesses were paid in cash out of these receipts with no record maintained as to the amounts. Cash and checks received in the motel businesses were used to make down payments for real property purchased by petitioners, yet no record of the amount of such disbursements was maintained. Petitioners are reasonably intelligent individuals and should have known that such records *250 as were kept were grossly inadequate. The failure to maintain complete and adequate records of income is an indicium of fraud. Lollis v. Commissioner,595 F. 2d 1189, 1192 (9th Cir. 1979); Estate of Mazzoni v. Commissioner,451 F. 2d 197, 202 (3d Cir. 1971); Friedman v. Commissioner,421 F. 2d 658, 659 (6th Cir. 1970), affg. per curiam a Memorandum Opinion of this Court; Grosshandler v. Commissioner,75 T.C. 1, 20 (1980). During the course of the audit, petitioners made several misleading or false statements to respondent's agents. They claimed that all net receipts after cash payments were deposited in their bank accounts, and also claimed to have reported all their income. Their statements were false. They promised to supply respondent's agents with daily receipt records for the motels, knowing that such records did not exist. Such false and misleading statements are also evidence of petitioners' fraudulent intent. Powell v. Granquist,252 F. 2d 56, 60 (9th Cir. 1958); Estate of Mazzoni v. Commissioner,supra,451 F. 2d at 202; Grosshandler v. Commissioner,supra,75 T.C. at 20; *251 Sunbrock v. Commissioner,48 T.C. 55, 66 (1967). During the course of the audit, petitioners repeatedly promised to supply respondent's agents with complete records as to petitioners' real estate transactions, and bank accounts, in addition to gross receipts records of the various motels they managed. Petitioners failed to produce these materials, consistently failing to cooperate with respondent's agents. A failure to cooperate which has the effect of misleading or attempting to conceal facts is indicative of fraud. Powell v. Granquist,supra,252 F. 2d at 60; Millikin v. Commissioner,298 F. 2d 830, 836 (4th Cir. 1962); Estate of Beck v. Commissioner,56 T.C. 297, 365 (1971). Petitioners' failure to cooperate persisted throughout the pendency and trial of this case. Furthermore, a pattern of consistent underreporting of income for a number of years, especially when accompanied by other circumstances showing an intent to conceal, justifies the inference of fraud as to each of the years. Holland v. United States,supra at 139; Lollis v. Commissioner,supra,595 F. 2d at 1191; *252 Furnish v. Commissioner,262 F. 2d 727, 729 (9th Cir. 1958); Baumgardner v. Commissioner,251 F. 2d 311, 322 (9th Cir. 1957); Kurnick v. Commissioner,232 F. 2d 678, 681 (6th Cir. 1956). The other circumstances indicating an intent to conceal herein include petitioners' false and misleading statements and refusal to produce requested documents. Petitioners' pattern of underreporting income indicates their fraudulent intent as to each of the years in issue. Based on the record as a whole, it is clear that petitioners' underpayment of tax each year was attributable to their fraudulent intent to evade tax. [15] Respondent's imposition of the fraud addition is sustained as to both petitioners for all years. Our decision *253 that petitioners' joint income tax returns for their 1972, 1973, and 1974 taxable years were fraudulent with intent to evade tax disposes of petitioners' claim that the statute of limitations bars assessment of the deficiencies and additions to tax herein. Since their returns for these years were fraudulent, the tax may be assessed "at any time." Sec. 6501(c)(1). To reflect the foregoing, Decision will be entered for the respondent.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years at issue.↩
2. Only their 1973 joint return was timely filed. By reason of an automatic extension of time within which to file, petitioners had until June 15, 1973 to file their 1972 return, but did not actually file it until June 26, 1973. An automatic extension was likewise granted for their 1974 taxable year, but their 1974 return was not filed until June 19, 1975, subsequent to the extension which expired on June 15, 1975.↩
3. In 1972, Mr. Stephens became associated with Robert Torp and David Weirich in a partnership for the purpose of purchasing and operating the Aquarama Motor Lodge. The motel was purchased on a land contract at a principal cost of $450,000, allocated one-third to each partner. Articles of Incorporation were filed incorporating the partnership on November 8, 1974. The name of the corporation was Pine Shores, Inc., and it reported income as a Subchapter S corporation for all three years 1972-1974.↩
4. Mr. Stephens personally prepared petitioners' individual income tax returns for the years in issue. He also prepared but did not sign the partnership returns for the Skyline, Crown, and Viking Motels. The partnership returns were completed with great detail, including a reconciliation of the partners' capital accounts. The returns for Pine Shores, Inc., were prepared by a Mr. David Weirich.↩
5. The problems encountered were numerous. Some of the banks stopped advancing operating funds to petitioners. Other accounts had been garnished by creditors. ↩
6. During audit, Mr. Stephens claimed that only Canadian currency received in operation of the motels was so deposited.↩
7. On brief petitioners again seek to have the facts deemed admitted under Rule 37(c) set aside, stating: The first issue in this case is to have the deemed admitted facts under Rule 37(c) set aside because taxpayer thought the required answers had been taken care of by his council [sic]. The petitioners would like to ask The Court to reconsider the ruling because petitioners never received the notice required to make them aware of the necessity to answer. The petitioners have never had their day in court pertaining to these issues. Petitioners' statements are incorrect and misrepresent the record in the case. The Rule 37(c) order was entered by the Court in December 1979, almost a year after petitioners' first counsel moved to withdraw from the case. The case was calendared for trial for the first time some 10 months later and petitioners' new counsel (retained during the trial session) moved for a continuance, stating that they wished to prepare petitioners' case for trial and would seek to have the Court set aside the Rule 37(c) deemed admissions. The Court, in the presaside the Rule 37(c) deemed admissions unless and until petitioners cooperated with their counsel to prepare the case for trial.The Court granted the continuance only upon Mr. Stephens' assurances (stated on the record in open court) that he would cooperate with his new counsel in preparing the case for trial. Mr. Stephens thereafter failed to do so, and the new attorneys were compelled to ask the Court for leave to withdraw from the case because petitioner's refusal to cooperate made it impossible for them to comply with the Court's order of October 1, 1980. After the withdrawal of the new counsel, the Court thereafter issued to petitioners directly an order to show cause and upon petitioners' failure to respond thereto dismissed the case as to the deficiencies for petitioners' failure properly to prosecute. Rule 123(b), Tax Court Rules of Practice and Procedure.
Moreover, the parties' stipulations of fact and respondent's case-in-chief at trial sufficiently established the facts in regard to both the deficiencies and the fraud additions. The Court would have arrived at the same result in this case even without the Rule 37(c)↩ deemed admissions and without the dismissal for lack of prosecution as to the deficiencies.
8. See also Phillips v. Commissioner,T.C. Memo. 1984-133; Compton v. Commissioner,T.C. Memo. 1983-642; Nunez v. Commissioner,T.C. Memo. 1969-216; Gorin v. Commissioner,T.C. Memo. 1968-57↩. 9. The Court's order establishing petitioners' liability for the deficiencies asserted herein does not also serve to relieve respondent of the requirement that he prove the existence of an underpayment. Respondent must prove all elements of fraud by clear and convincing evidence, a higher standard than that applicable to taxpayer's contesting a determination of a deficiency. Sec. 7454; Rule 142(b), Tax Court Rules of Practice and Procedure.↩
10. The aggregate amount of cash on hand and stocks and bonds included in respondent's net worth computation for December 31, 1971 is $10,918.19, representing approximately 0.6 percent of petitioners' total assets of $1,865,326.83. When the sum of $1,302.64, representing loan receivables, is included for December 31, 1972 and years thereafter, the aggregate amount of cash on hand, stocks and bonds, and loan receivables is $12,220.83, or 0.65 percent of petitioners' opening total assets of $1,865,326.83. The figure for stocks and bonds ($5,918.19) was the same for the opening net worth as for the years 1972, 1973, and 1974 and did not serve to increase petitioners' net worth in any year; similarly a constant figure of $5,000 was used for cash on hand each year and did not represent any increase in net worth. The loans receivable figure of $1,302.64 for each of the years 1972, 1973, and 1974 was an insignificant percentage of any increase in net worth for those years. The only significant item is cash on hand, which petitioners now try to increase in the opening net worth by the proverbial "cash hoard."↩
11. Petitioners do not suggest that they saved any portions of the income that were sheltered from tax by the depreciation deductions, and instead suggest that the depreciation deductions were an actual cash item. Petitioners' argument on brief was as follows: The petitioner states to the court that these monies were accumulated from reserve for depreciation. That is if a businessman takes in $300,000 and sets up three accounts of $100,000 each and calls one account expense, another account reserve for depreciation, and another account net income, he pays tax only on the net income. If he does not choose to use the reserve for depreciation account to replace worn out buildings and equipment, he can use the money from that account at his own descretion [sic]. If he disires [sic] he can buy beer or gamble it away and has by statute no obligation to pay any tax what-so-ever [sic] on these monies. This is the primary reason why most businessmen are businessmen and not doctors of [sic] lawyers or some other professional person. They are not limited to their own production. Petitioners are, however, limited to reality, and there are no facts to support their imaginary scenario. ↩
12. Petitioners also apparently contend that their depreciation deductions in years previous to those now in issue were not properly taken into account in computing their opening net worth. The record herein is to the contrary. All prior years' depreciation to which petitioners were entitled is reflected in their opening reserve for depreciation, a liability decreasing their opening net worth.↩
13. See also Phillips v. Commissioner,supra;King v. Commissioner,T.C. Memo. 1978-351, affd. without published opinion, 607 F. 2d 996 (2d Cir. 1979); Mladinich v. Commissioner,T.C. Memo. 1969-185; Rice v. Commissioner,T.C. Memo. 1960-155; Helvey v. Commissioner,T.C. Memo. 1956-123↩.
14. See also Kattar v. Commissioner,T.C. Memo. 1984-387↩.
15. Apart from the deemed admissions which relate to both petitioners, much of the other evidence tending to show fraud and offered herein concerns only Mr. Stephens. However, Mrs. Stephens was an active participant in the operation of petitioners' motel businesses and the record, taken as a whole, clearly convinces us that she was also aware of and actively participated in their fraudulent underpayment of tax.↩